[Crim. No. 43810. Second Dist., Div. Three. Mar. 8, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR RICHARD JACKSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*At the direction of the court, and pursuant to California Rules of Court, rules 976 and 976.1, the portion of the opinion certified for publication follows.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ralph H. Goldsen and Tom Stanley, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUI, J.—The major question in this appeal requires us to determine whether the legislative provisions set forth in Penal Code sections 28 and 29, which limit the scope of psychiatric testimony and abolish the defense of diminished capacity,[1] deprived appellant of a fair trial. We hold that these provisions are constitutional. We modify and affirm the judgment of conviction and remand the matter for resentencing for the reasons indicated below.

---

[1] At the time of appellant's offense, these sections provided as follows:

Penal Code section 28: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible on the issue as to whether the criminal defendant actually formed any such mental state. [¶] (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action. [¶] (c) This section shall not be applicable to any insanity hearing pursuant to Section 1026 or 1429.5."

Penal Code section 29: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

All further references are to the Penal Code unless otherwise indicated.

## Factual Background

The circumstances of the crime are not in dispute. On January 26, 1981, appellant Arthur Richard Jackson saw the film "Defiance," in which actress Theresa Saldana appeared. Two days later, he began to think about killing her.

Nearly a year later, Jackson came to the United States from England and engaged a private investigator to find Saldana's home address.

On the morning of March 15, 1982, he went to her home. A neighbor saw Jackson walking a half block from Saldana's home, carrying a black satchel. Thirty minutes later the neighbor "saw the same gentleman go by again and I thought it was a little different than the ordinary person going back and forth." Jackson walked back and forth three or four times in the next hour.

At 10 a.m., Saldana left her home. As she was about to enter her car she "suddenly heard someone" over her left shoulder. She turned and Jackson "said very slowly, 'Are you Theresa Saldana?'" Saldana immediately attempted to run but Jackson held and stabbed her repeatedly.

Saldana was severely wounded in the chest and thigh. The attack finally ended when a passerby, Jeff Fenn, restrained Jackson until the police arrived. Several nerve tendons in one of her hands were severed as she attempted to wrestle the knife from appellant. She was taken to the hospital "virtually moribund."

While waiting for the police, a witness asked Jackson why he had stabbed Saldana. Jackson replied that it would all be explained by the contents of his black satchel which lay in the street.

The satchel contained a document entitled "Death Sentence Petition" and a diary inscribed with Jackson's name, "Care of the office of Michael, the archangel and vice-president of heaven."

Although the defendant elected not to enter an insanity plea, the defense consisted solely of the expert testimony of two forensic psychiatrists. Through psychiatric testimony, the defense attempted to establish that Jackson had a mental defect which precluded him from having the specific in-

tent, malice aforethought and premeditation necessary to sustain a conviction for attempted murder as charged.[2]

Prior to the testimony of the psychiatrists, the trial court stated that Penal Code sections 28 and 29 required that psychiatric testimony be limited to their "opinion as to the mental state of the defendant" at the time of the crime, and barred psychiatric testimony on the ultimate conclusion of law stating that such a conclusion "is for the trier of fact."

The extensive testimony of the defense psychiatrists can be summarized briefly. Jackson was categorized as a chronic paranoid schizophrenic who, since 1952, suffered from an obsessive thought pattern which resulted in compulsive behavior, i.e., "behavior that one pursues without the thought of consequence." As one of the defense psychiatrists testified in plain terms, "the man is crazy."

In the present incident, Jackson believed himself to be acting on behalf of the "Order of the Knights of St. Michael" and the "Kingdom of Heaven." He believed that he was on a divine "mission" to kill Saldana and take her "with [him] to the hearafter [*sic*], the better life, God's kingdom."

Jackson himself intended to be executed by the state "with music over the public address system" and "light refreshment for the observers."

Jackson was aware that he had no right to kill Saldana, but "felt that the laws under which he was acting were of a greater force."

Both psychiatrists directly related their diagnosis to Jackson's mental condition at the time of the crime. Dr. Markman testified that Jackson's conduct was "absolutely" a product of his mental disease.

Dr. Stalberg concurred, stating that Jackson's "act was the product of a psychotic compulsion as a result of his chronic paranoid schizophrenia." He defined compulsion as "an act that an individual is driven or forced to carry out by inner psychological mechanisms and an act over which that individual has little or no control, [a] nearly involuntary act."

---

[2]At the time of trial, the American Law Institute's mental insanity test was the rule of law in California. Under this test, " '[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*People* v. *Drew* (1978) 22 Cal.3d 333, 345 [149 Cal.Rptr. 275, 583 P.2d 1318].) Thus, the theory of defense suggested an insanity plea. We assume it was a tactical judgment to forego such a plea.

Dr. Markman testified that a paranoid schizophrenic like Jackson "can look and function in a controlled manner to the point where most other people wouldn't take notice."

The People presented testimony of Dr. Jay Ziskin, Ph.D., a psychologist, as a rebuttal witness who testified that it was his opinion that psychiatrists were "worthless" in reconstructing previous mental states.

Following the issuance of several instructions to the jury over defense objections, the matter was submitted to the jury for its decision. The jury apparently rejected the evidence regarding Jackson's mental state and returned a verdict of attempted murder in the first degree (§§ 187, 664) and assault with a deadly weapon (§ 245, subd. (a)). The jury further found that Jackson had used a deadly weapon within the meaning of sections 12022, subdivision (b), and 1203.075, and that he had inflicted great bodily injury on Saldana within the meaning of sections 12022.7 and 1203.075.

The court imposed the high base term of nine years for the attempted murder and imposed an additional three-year enhancement on the finding of great bodily injury. The sentence imposed on the assault charge was stayed.

CONTENTIONS

Appellant contends on appeal that:

1. Sections 28 and 29 were impliedly repealed by the Truth-in-Evidence provisions of Proposition 8.

2. Sections 28 and 29 are an unconstitutional limit on the due process right to present evidence.

3. The trial court erred in failing to give an instruction relating appellant's psychiatric defense to the mental state issues of malice and premeditation.

4. The trial court erred in instructing the jury on attempted first degree murder by lying in wait, as there was no evidence of concealment.

5. The trial court erred in imposing the aggravated term.

Respondent controverts these contentions.

DISCUSSION

I

*Proposition 8 Is Inapplicable to the Present Case*

In his opening brief, Jackson contends that sections 28 and 29 were impliedly repealed by the Truth-in-Evidence provision of Proposition 8. (Cal. Const., art. I, § 28.) ▮ However, it is now settled that Proposition 8 is inapplicable where, as here, the crime occurred prior to its enactment. (*People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

II

*Penal Code Sections 28 and 29 Do Not Impose an*
*Unconstitutional Limit on the Due Process*
*Right to Present a Defense*

The theory of Jackson's defense at trial was that he did not have the mental state necessary to constitute attempted murder in the first degree. His primary contention on appeal is that the evidentiary restrictions imposed by the Legislature in sections 28 and 29 are so severe that he was deprived of his due process right to present this defense.

We disagree. For the reasons stated below, we conclude that the restrictions are a legitimate legislative determination on the admissibility of a class of evidence and, in the present case, did not deprive the defendant of his right to present a defense.

A. *Penal Code Section 28*

Penal Code section 28 precluded Jackson from introducing evidence that he lacked the *capacity* to formulate malice aforethought and to premeditate. Section 28 limits the admissibility of evidence of mental defect to the issue of "whether the criminal defendant *actually formed*" the mental state. (Italics added.)

▮ Jackson urges that this prohibition deprived him of the right to present a defense as it "deprived appellant of credible evidence from which a reasonable doubt could have arisen."

All "relevant" evidence, of course, is not admissible. Evidence Code section 351 provides: "*Except as otherwise provided by statute,* all relevant evidence is admissible." (Italics added.) The Legislature has carved out

several exceptions where potentially relevant evidence is excluded on grounds of unreliability or public policy. (See, e.g., Evid. Code, § 900 et seq. (privilege) and § 1200 et seq. (hearsay).)

The restrictions of Penal Code section 28 are nothing more than a legislative determination that for reasons of reliability or public policy, "capacity" evidence is inadmissible.

In evaluating the constitutionality of the section, the question is whether the exclusion of capacity evidence prevented Jackson from disproving the mental state necessary to the charge. In other words, whether the restriction deprived Jackson of his constitutional right to require the People to prove every fact necessary to constitute the crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) We hold that such exclusion is not of constitutional dimensions.

Admittedly, the question whether mental disease *actually* prevented Jackson from forming the requisite mental state may be a more difficult question than whether persons suffering from mental disease might have difficulty *in general* in forming such a mental state.

Jackson, however, has no cause to complain in the present case because the defense psychiatrists essentially answered the more difficult question of whether his condition prevented him from forming the requisite mental state. The defense psychiatrists testified that on the precise day of the stabbing, Jackson's action was a result of his mental disease and a psychotic compulsion, which was defined as a "nearly involuntary act." The jury simply did not believe that the mental disorder interfered with Jackson's ability to form the required mental state.

Jackson relies on *People* v. *Wetmore* (1978) 22 Cal.3d 318 [149 Cal.Rptr. 265, 583 P.2d 1308], in support of his argument that capacity evidence cannot be excluded. In *Wetmore,* the Supreme Court struck down a rule which barred the admission of evidence of diminished mental capacity at the guilt phase, where an insanity defense could be raised at a later phase. The Supreme Court rejected the distinction between mental capacity evidence and actual mental state evidence, stating: " '[A]s a matter of logic, any proof tending to show that a certain mental condition could not exist is relevant and should be admissible to show that it did not exist. . . .' [Citations.]" (*Wetmore, supra,* 22 Cal.3d at p. 324.)

This case was decided prior to the Legislature's enactment of section 28, which eliminated both capacity evidence and the diminished capacity de-

fense. Therefore, *Wetmore, supra,* 22 Cal.3d 218, is inapposite to the instant situation.

B. *Penal Code Section 29*

Penal Code section 29 prohibits an expert from testifying whether the defendant had or did not have "the required mental states" at the time of the offense. The section places the determination of this ultimate fact in the exclusive province of the trier of fact.

Jackson claims that the exclusion of expert opinion testimony on this ultimate fact rendered his defense meaningless. He claims that a lay jury could not determine the ultimate issue, i.e., whether or not he had the requisite mental state, "without expert guidance on how mental disorder relates to mental states."

Although expert testimony which embraces the ultimate issue to be decided by the trier of fact is generally admissible (Evid. Code, § 805), a court does not abuse its discretion when it determines that the jury is fully capable of deciding the question posed to the expert based on their own experience. (See, e.g., *Kennemur* v. *California* (1982) 133 Cal.App.3d 907 [184 Cal.Rptr. 393].)

Here, the Legislature has determined that judges and lay jurors are capable of deciding whether a defendant's mental illness results in an inability to form the mental state legally required to sustain the charge. We cannot hold, as a matter of law, that this determination is incorrect. The ultimate issue to be decided is, after all, a legal issue, not a scientific one.[3]

Regardless of the wisdom of the Legislature's allocation, it is clear that Jackson was afforded an ample opportunity to present his defense in this case. Although the psychiatrists could not specifically testify that Jackson did not premeditate or have malice aforethought, they did present lengthy testimony describing Jackson's mental illness and its effect on his conduct.

Both defense psychiatrists testified that Jackson's action was a direct product of his mental disease. Indeed, Dr. Stalberg essentially testified that due to Jackson's mental illness, the stabbing was a "nearly involuntary act."

---

[3]At trial, the People's rebuttal witness, Dr. Ziskin, testified that, in his view, psychiatrists and their opinions are useless in reconstructing previous mental states. Indeed, some legal scholars would preclude the introduction of all psychiatric testimony on mental state issues on the grounds of its inherent unreliability. (See, e.g., Morse, *Experts and the Unconscious* (1982) 68 U. Va. L.Rev. 971, 991.)

It is significant to note that much of the psychiatric testimony was given in terms which could be easily understood by lay jurors. Psychiatric terms were defined and medical conclusions were explained. Both psychiatrists referred to Jackson colloquially as "crazy."

Moreover, in closing argument, defense counsel linked the testimony of the psychiatrist to the mental elements required for conviction. For example, defense counsel urged the jury to examine the doctor's opinion and come to the conclusion that the conduct was a result of an "involuntary" psychotic compulsion.

### III-V*

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Due to the omission of an instruction relating premeditation to Jackson's mental state defense, the verdict of attempted murder in the first degree cannot be upheld. The defendant is entitled to a reduction to attempted murder in the second degree. Pursuant to section 1260,[10] we remand the matter and direct the trial court to reduce the judgment of conviction to attempted murder in the *second* degree.

In view of the court's failure to state sufficient facts justifying the imposition of the upper term, the matter is further remanded for the limited purposes of resentencing appellant for his conviction of attempted murder in the second degree. Should the court choose to impose the upper term, it should state sufficient factors justifying the imposition of said term pursuant to section 1170, subdivision (b), and rule 439(c).

Klein, P. J., and Danielson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 31, 1984. Kaus, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 961.

[10]Section 1260 provides that "[t]he court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."