[Crim. No. 12853. Third Dist. June 5, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN McCOWAN, Defendant and Appellant.

4

**COUNSEL**

Howard E. McEwan, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Nancy Sweet and Tom Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REGAN, J.**—Following the filing and publication of our opinion in this case, the California Supreme Court granted hearing and transferred the cause to that court. Recently, the Supreme Court ordered the cause retransferred to this court for reconsideration in light of *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752]. Pursuant to that mandate, we have made appropriate modifications in light of *Skinner* and now republish our decision as so modified.

Defendant appeals from the judgment sentencing him to life imprisonment without the possibility of parole after a jury convicted him of first degree

murder (Pen. Code, §§ 187, subd. (a), 189),[1] second degree murder (§§ 187, subd. (a), 189) and attempted murder (§§ 187, subd. (a), 664). The jury also found true the special circumstance of multiple murders (§ 190.2, subd. (a)(3)), that defendant personally used a firearm in the commission of those offenses (§ 12022.5), and that defendant personally inflicted great bodily injury in the commission of the attempted murder (§ 12022.7).

With respect to the conviction of these crimes in the guilt phase of trial, defendant raises numerous claims of error, urging reversal of the judgment. We reject those claims and uphold the verdicts. However, in the sanity phase of the trial, wherein defendant pled not guilty by reason of insanity, defendant contends the court improperly instructed the jury regarding the insanity standard. *Skinner* compels our agreement with defendant's point, and consequently, we must remand the case for a new hearing and determination of defendant's sanity at the time of the crimes.

## FACTS

In March 1982 defendant and his wife Thaymer were divorced, ending a lengthy marriage. Lois Leary, Thaymer's mother, had lived with defendant and Thaymer during the last two years of the marriage. Lois was separated from her husband, Robert.

The dissolution proceedings had been bitter, and relations between defendant and Thaymer remained strained following their dissolution. Defendant lived in a converted drapery shop in front of the Sacramento County residence where Thaymer and Lois lived. On the evening of August 20, 1982, defendant shot and killed Thaymer and shot and wounded Lois near their home.

Shortly after the shootings, defendant went to the residence of his former girlfriend, Mary Crawford. He told Crawford to give some boat parts to a friend, stated he had killed Thaymer and Lois, and told her that she (Crawford) did not know him. Defendant then left and went to the home of Robert Leary, where he shot and killed Leary.

Defendant surrendered himself to authorities the day after the shootings. After waiving his rights, defendant gave a taped statement in which he admitted the shootings. Defendant told police stress from his employment situation, dissolution proceedings, his father's death, problems with Thaymer's attorney, and the breakup with Crawford collectively had been more

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

than he could bear. On the day of the shootings, defendant had left work early in order to obtain more Librium from his doctor at Kaiser Hospital. Later that day, he consumed four beers and four other alcoholic drinks. That evening, Thaymer made an obscene gesture at him as he drove by her home. Defendant became enraged, and when Thaymer appeared to be reaching for something in her vehicle, he grabbed his gun and started firing. He shot at Lois three times, feeling total hatred for her.

After reloading his gun in Robert's driveway, defendant stated he shot Robert once, then four more times after he fell, at close range. He felt a "surging, raw hate" as he killed Leary. Defendant then went to the law offices of Thaymer's attorney, Jack James, intending to shoot him, but the attorney was gone. He knew where James lived, but did not want to hurt innocent people. Instead, he went to a motel and tried to kill himself, but could not bring himself to do it. His explanation for the shootings was as follows: "I just completely lost control, and that's all there was to it. Insanity. Insanity."

At trial, defendant presented evidence of his bitter relationship with Thaymer, Lois and Robert, and Thaymer's attorney. Defendant believed they had treated him unfairly. He was depressed and suicidal during the dissolution proceedings. He became involved in an altercation with Thaymer's attorney after one court proceeding, and the attorney had threatened him with violence. Moreover, after first agreeing to testify favorably for defendant, Robert later changed his mind.

Defendant had stated he wanted to kill Thaymer. He also had said he would like to kill Thaymer, Lois, Robert and James together, then himself. Sometime in 1982 he told friends he had imagined Thaymer was in his room and that he had fired a bullet at her image, striking a totem pole.

Following a violent argument between defendant and Crawford, defendant went to see Dr. Kenneth Patton, a psychologist. Patton saw him twice, in December of 1981 and March of 1982. In December, defendant told Patton his girlfriend and one of his daughters believed he was "losing his grip." Defendant thought the dissolution proceedings were primarily the cause of his troubles. He had considered suicide. In March he was continuing to experience stress and had thought about harming his wife and her attorney. He obtained a prescription for Librium, an anti-anxiety drug. Patton found no evidence of psychosis or delusional behavior, and concluded defendant was suffering a stress reaction secondary to divorce.

Defendant testified he saw Dr. Patton because he was concerned he could not control himself. He had strange dreams, from which he would awaken

wanting to kill Thaymer, Lois, Robert, James and himself. On the evening of the shootings, defendant testified he loaded some items into his automobile, including a pistol, which he usually kept there. When he saw Thaymer and Lois drive by he followed them to see whether they were leaving the area. When Thaymer made an obscene gesture at him, defendant became upset and confronted Thaymer. He had his gun because he thought Thaymer had one. He could not remember much after he walked over to Thaymer. He recalled being at the attorney's office, but did not recall anything about Robert's home. He could not explain why he had remembered details of the shootings the day after they occurred but could not recall them at trial.

Dr. Elmer Galioni, a psychiatrist testifying for defendant, interviewed defendant on three occasions. He opined that defendant suffered from a mental disorder which he characterized as a "major depressive episode." Dr. Galioni believed defendant's mental disorder had a significant impact on his mental process the night of the shootings. The disorder had a number of symptoms: depression, insomnia, loss of interest in activities, periods of agitation and irritability, recurrent thoughts of suicide, and physical and mental fatigue.

Dr. Galioni's diagnosis was based on the stresses defendant suffered as a result of the dissolution proceedings, threats by James, work difficulties, his father's death, and the breakup with his girlfriend, as well as the "psychotic break" involving the hallucinations in which he shot at the totem pole. A person in his situation could not control his emotions because the stresses were so great. The emotions were so intense that he had great difficulty in thinking clearly and making judgments.

On cross-examination, Dr. Galioni admitted there is controversy among psychiatrists about whether a psychiatrist has the ability to diagnose a person's previous mental state with any reliability. He agreed that an opinion about a past mental state generally carries with it a greater risk of error than an opinion about a current mental state.

During the first interview with defendant, Dr. Galioni did not discuss the events of August 20, 1982. Defendant was depressed at the first interview, but not psychotic. In the second interview, defendant related his previous feelings of wanting to hurt others. He told Dr. Galioni how he killed Thaymer and Robert and wounded Lois. In a previous interview with another doctor, defendant could not recall what happened after he approached Thaymer.

Dr. Galioni acknowledged it is critically important in interpreting a person's past mental state to know what the person felt at the time. While he

believed he had asked defendant what he thought when he fired at Thaymer, his notes did not reflect that question. He could not recall asking defendant his reasons for the shootings. When he asked what defendant's feelings were, defendant replied he felt completely out of control. Dr. Galioni asked what defendant thought when he left his ex-girlfriend's place; defendant said he was going to Robert's home to shoot him. Although important, that statement was not in his notes.

Dr. Galioni listened to the police interview with defendant. Defendant sounded coherent and lucid, with his memory intact. Defendant's statement to Crawford that he shot Thaymer and Lois and that she did not know him might indicate he recognized what he had done and the consequences of his actions. Defendant reloaded his gun while he was in the driveway of Robert's residence, contrary to Dr. Galioni's understanding. Dr. Galioni admitted that was significant activity, but had not asked defendant about it. Moreover, although he admitted it was important, Dr. Galioni did not ask defendant why he had fired four more times at Robert after first shooting him.

At the sanity phase, the parties stipulated that the evidence presented during the guilt phase would be received as evidence for the sanity phase.

During the sanity phase, Dr. Galioni again testified for defendant. In his opinion, defendant was suffering from a mental disorder at the time of the offenses that rendered him incapable of knowing or understanding the nature and quality of his acts and incapable of distinguishing right from wrong. Defendant's mental disorder was a major depressive episode, which progressed to the point where he had periods of being overtly psychotic. Dr. Galioni pointed to the hallucinations associated with the totem pole incident as support for his conclusions. He opined that the totem pole incident was a strong indication of mental disease. Defendant was completely out of touch with reality, unable to know right from wrong.

In Dr. Galioni's interviews with defendant following completion of the guilt phase, defendant stated he felt angry and "disjointed" at the time of the offenses. He heard the sounds of the gun firing, but could not remember doing the shooting. He had no control. He could not recall driving to Robert's house and was not aware of having his gun with him or of reloading it. Defendant was unaware of knocking on the door or ringing the doorbell, shooting the gun, or seeing Robert fall.

When defendant gave his statement to authorities, he could not distinguish between what actually happened and what he had dreamed. He did remember

thinking of going to a motel to kill himself. Defendant had no recognition of right or wrong.

Dr. Galioni discussed with defendant the inconsistencies between his statements to police and the interviews after the guilt phase. The psychiatrist attributed the inconsistencies to "patchy forgetfulness"; defendant's mind was protecting him from the unpleasant experience of the shootings. For example, although he had difficulty distinguishing between dreams and reality, defendant gave boat parts to Crawford; yet he did not recall doing so. His statement to police that he did not go to James' residence because he did not want to hurt innocent people reasonably could be interpreted to mean defendant had considered the rights of others.

The jury found defendant sane at the time he committed the offenses.

## DISCUSSION

### I

Over defense objections, the trial court ruled the defense could not "ask any psychiatrists or other expert on mental condition a question as to whether or not the defendant had the capacity to form a mental state in issue here on the date of the alleged commission of the offense." The court also barred expert testimony "as to whether or not the defendant did or did not form the required mental state at the time of the alleged commission of the act, . . ." The court expressly relied on sections 25, 28 and 29 for its rulings.

Section 25, subdivision (a), states in part: "The defense of diminished capacity is hereby abolished. In a criminal action, . . . evidence concerning an accused person's . . . mental illness, disease, or defect shall not be admissable [sic] to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

Section 28 provides in pertinent part: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [¶] (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a

criminal action . . . . [¶] . . . (d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to admit or exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense.''

Section 29 states: ''In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.''

██ Defendant contends: (1) the trial court's rulings prohibiting defendant from presenting relevant evidence in his behalf violated defendant's due process rights and his right to compulsory process of witnesses; (2) the rulings unconstitutionally relieved the prosecution of its burden of proving all elements of the offenses beyond a reasonable doubt; and (3) the ruling prohibiting expert opinion testimony regarding defendant's mental state at the time of the offenses violated his right to equal protection of the laws.

Proposition 8 added section 25 to the Penal Code. The Legislature enacted sections 28 and 29. Defendant's crimes occurred in August 1982. Proposition 8 became effective on June 9, 1982. (Cal. Const., art. I, § 28; art. XVIII, § 4.) Accordingly, the provisions of that initiative measure apply to defendant. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-258 [193 Cal.Rptr. 692, 667 P.2d 149].)

██ Not all relevant evidence is admissible. Evidence Code section 351 provides that all relevant evidence is admissible except as otherwise provided by statute. The Legislature has created exceptions where relevant evidence is excluded on grounds of unreliability or public policy. (See Evid. Code, § 900 et seq. [privilege] and § 1200 et seq. [hearsay].)

██ Both the Legislature and the electorate have the power to enact criminal statutes which define the elements of crimes. (Cal. Const., art. II, § 8; Pen. Code, § 6; *In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017].) A fortiori, they also have the power to determine which defenses will exist and the mental states required for the commission of crimes. ██ The restrictions imposed by sections 25, subdivision (a), 28 and 29 are determinations by the electorate and the Legislature that for reasons of reliability or public policy, capacity evidence is inadmissible.

In *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 965 [199 Cal.Rptr. 848], the accused's defense to an attempted murder charge was that he

lacked the requisite mental state by reason of mental defect. Prior to the testimony of the defendant's psychiatric witnesses, the trial court stated that sections 28 and 29 limited testimony to their opinion regarding the defendant's mental state at the time of the crime and barred psychiatric testimony on the ultimate conclusion of law.

The court of appeal held that the evidentiary restrictions imposed by sections 28 and 29 were not so severe that the accused was deprived of his due process right to present the defense that he lacked the requisite mental state. It held that the statutory restrictions were a legitimate legislative determination on the admissibility of a class of evidence. (*Jackson, supra,* 152 Cal.App.3d at pp. 968-969.)

■ In evaluating the constitutionality of sections 25, subdivision (a), and 28, we must determine whether the exclusion of capacity evidence prevented defendant from disproving the mental state necessary to the charges. (*Jackson, supra,* 152 Cal.App.3d at p. 968.) ■ Defendant has the right to present a defense, which includes both his version of the facts and the testimony of witnesses. (*Washington* v. *Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023, 87 S.Ct. 1920].) ■ Moreover, the prosecution is required to prove every fact necessary to constitute the crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)

■ Examination of the record discloses defendant was permitted to present evidence suggesting that his mental condition prevented him from forming the required mental state at the time he committed the offenses. Dr. Galioni testified that his mental disorder, a "major depressive episode," had a significant impact on his mental process the night of the shootings. According to Galioni, defendant essentially was out of control, unable to think clearly or make judgments without great difficulty. The cause of his condition was the existence of numerous, intense pressures and stresses.

Defendant cites *People* v. *Wetmore* (1978) 22 Cal.3d 318 [149 Cal.Rptr. 265, 583 P.2d 1308] in support of his argument that capacity evidence cannot be excluded. In *Wetmore,* the Supreme Court voided a rule barring admission of evidence of diminished mental capacity at the guilt phase, where an insanity defense could be raised at a later phase. The court rejected the distinction between mental capacity evidence and actual mental state evidence. (*Id.,* at p. 324.)

*Wetmore* was decided prior to enactment of sections 25, subdivision (a), and 28. These statutes eliminate both capacity evidence and the diminished capacity defense. Accordingly, *Wetmore* is inapposite here.

Section 29 prohibits an expert from testifying whether the accused had the requisite mental state at the time of the offense, placing determination of that ultimate fact in the province of the trier of fact.

Defendant urges section 29 is an unequal and discriminatory prohibition of the use of expert testimony by defendant and others similarly situated. We disagree.

Defendant misconstrues the scope of the prohibition contained in section 29. Contrary to his assertion, the statute does not forbid an expert from stating his opinion about the accused's mental state. Dr. Galioni stated his opinion that, as a result of defendant's mental disorder, he was out of control when he committed the offenses. Section 29 precluded Dr. Galioni only from testifying whether defendant had one of the mental states required for the offenses—for example, malice aforethought. That ultimate determination must be made by the trier of fact.

Section 29 properly may be viewed not as a prohibition on the use of expert testimony, but as a limitation on the use of expert testimony, and a determination that such testimony on the ultimate issue whether the accused had the requisite mental state is unnecessary. Expert testimony embracing the ultimate issue to be decided by the trier of fact generally is admissible. (Evid. Code, § 805.) However, it is not an abuse of discretion for a court to find the jury fully capable of deciding the question posed to the expert based on its own experience. (*Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 926 [184 Cal.Rptr. 393].)

The Legislature has determined that judges and jurors are capable of deciding whether a defendant's mental illness resulted in an inability to form the mental state required to sustain the charge. Such testimony is not "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) Although defendant disputes the wisdom of that determination, we cannot hold, as a matter of law, that the Legislature's policy decision is erroneous. (*People* v. *Jackson*, *supra*, 152 Cal.App.3d at p. 969.)

As we have said, defendant was permitted to introduce psychiatric testimony regarding his mental condition at the time of the offenses. He was precluded only from introducing capacity evidence and asking his psychiatrist whether the requisite mental state existed. These limitations did not prevent defendant from presenting his defense. We hold that sections 25, subdivision (a), 28, and 29 do not contravene defendant's constitutional rights to due process, use of witnesses, or equal protection, nor do they

relieve the prosecution of its proof burden. (See *People* v. *Jackson, supra,* 152 Cal.App.3d at pp. 968-970.)

## II

Defendant contends the trial court improperly instructed the jury at the conclusion of the guilt phase. According to defendant, the court erred when it: (1) refused to give a modified instruction; (2) gave instructions on heat of passion; (3) refused to give defendant's proposed instructions; and (4) confused the jury with an instruction. Defendant urges the errors were prejudicial and compel reversal.

■ CALJIC No. 8.77 (4th ed. 1979) was the diminished capacity instruction. After the Legislature enacted section 28, the instruction was discontinued. (CALJIC No. 8.77 (4th ed. 1986 pocket pt.) p. 113.) It is no longer a correct statement of the law. ■ Defendant's modifications to CALJIC No. 8.77 substituted the words "reduced" for "diminished" and "state" for "capacity."

Defendant claims the modifications comport with that portion of section 28, subdivision (a), which allows evidence of mental defect on the issue of whether the accused actually formed a required specific intent. We disagree.

Even in the modified form proposed by defendant, CALJIC No. 8.77 remains an instruction regarding capacity evidence; its admission is no longer permitted. The court properly instructed the jury on whether defendant actually formed the requisite mental state, by giving a modified version of CALJIC No. 3.36 ((4th ed. 1981 pocket pt.) p. 41). That instruction was nearly identical to one requested by defendant. The court properly refused defendant's proposed modifications.

■■ The court instructed the jury on heat of passion to reduce murder to manslaughter. Defendant claims he did not rely on such a defense at trial. Moreover, he asserts, the instructions directed the jury to measure his conduct against an objective standard of reasonableness, thereby prejudicing his defense which was predicated on a mental disorder, a subjective standard.

■ Defendant's contention is meritless. He himself requested *two* heat of passion instructions. Moreover, there was evidence he became enraged when Thaymer made the obscene gesture at him, and felt hatred for Robert when he shot him. On this record, irrespective of his wishes, the trial court was obligated to instruct on heat of passion sufficient to reduce murder to manslaughter. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 324-

326 [185 Cal.Rptr. 436, 650 P.2d 311]; citing *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].) There was no error.

 Defendant's proposed instructions on heat of passion were correctly refused as inaccurate statements of the law. All were concerned with formation of the requisite mental state and the use of evidence of mental defect. None properly limited the use of such evidence. Only the court's instruction, CALJIC No. 3.36 (as modified), was consistent with section 28, subdivision (a).

 Defendant urges CALJIC No. 3.36 confused the jury by implying the purpose for which evidence of mental defect was admitted was a "limited" one and thus "not important."

Defendant is mistaken. The court did not instruct the jury it could consider evidence of mental defect for a "limited" purpose. Rather, the court told the jury it could consider such evidence solely for the purpose of determining whether defendant actually formed the requisite mental states. As we have said, that instruction was a proper application of section 28, subdivision (a). Contrary to defendant's assertions, the modified version of CALJIC No. 3.36 clearly apprised the jury how to apply evidence of his mental defect to the requisite mental states. We assume that the jurors, properly instructed, were capable of understanding the instructions and that no confusion resulted. (*People* v. *Billings* (1981) 124 Cal.App.3d 422, 428 [177 Cal.Rptr. 392].)

## III

Defendant also moved to strike the special circumstances finding of multiple murders so that he might be eligible for parole. The trial court denied the motion, stating: "The Court has considered the evidence and the stresses the defendant was subjected to, stemming from his marital situation and his employment and financial situation, but the fact remains that Mr. McCowan murdered Thaymer McCowan, attempted to murder Lois Leary, and after visiting his girlfriend, went to Robert Leary's home and murdered him, went out in search of a fourth murder victim, and the Court in exercise of its discretion, finds and concludes that life imprisonment without the possibility of parole is the appropriate sentence, and accordingly, the motion to strike the special circumstances is denied."

 Defendant urges the court failed to exercise its discretion in considering the motion to strike the special circumstance. Relying on *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029] and

rule 443 of the California Rules of Court, defendant claims the court must state reasons for the exercise of its discretion.

*Williams* held that section 1385 authorizes the trial court in a murder case to dismiss a special circumstances finding and to modify sentence to life imprisonment with the possibility of parole. (*People* v. *Williams, supra,* 30 Cal.3d at pp. 477-490.) However, nowhere in *Williams* does the Supreme Court require trial courts to state their reasons for denying the motion. Section 1385 itself requires a statement of reasons only in the event of dismissal. Rule 443 of the California Rules of Court applies only when the giving of reasons is required.

Here, the record discloses the court properly exercised its discretion in denying the motion. There was no error.

## IV

Proposition 8 also added section 25, subdivision (b), to the Penal Code. Under that statute, a defendant may be found insane only when "he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b); italics added.)

 Defendant contends subdivision (b) constitutes a new insanity standard, rather than a restatement of the traditional *M'Naghten* standard.[2] Defendant contends the use of the word "and" between the two prongs of the insanity standard creates a new standard so narrow as to make proof of lack of mens rea a virtual impossibility, thus violating his due process rights. The People urge the statute merely reinstated the *M'Naghten* test as the measure of criminal insanity, and that the two prongs are indistinguishable.

The contentions have been answered in *People* v. *Skinner, supra,* 39 Cal.3d 765. In *Skinner,* the California Supreme Court held section 25, subdivision (b), was intended to reinstate the *M'Naghten* test as it was applied in California prior to the court's own decision in *People* v. *Drew* (1978) 22 Cal.3d 333, 336, fn. 2 and 339 [149 Cal.Rptr. 275, 583 P.2d 1318], abrogating the *M'Naghten* test and substituting therefor the American Law Institute standard. (*People* v. *Skinner, supra,* 39 Cal.3d at pp. 773-775, 777.) Under the test as it then existed, the two prongs of the standard were separated by an "or;" this disjunctive use of the *M'Naghten* standard stands "among the fundamental principles of our criminal law." (*Id.,* at p. 776.)

In *Skinner,* the defendant had strangled his wife while he was on a day pass from a state mental hospital, believing the killing was commanded by

---

[2](*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].)

God. (39 Cal.3d at p. 770.) The trial judge found defendant was sane, but in so finding he acknowledged it was more likely than not that defendant suffered from a mental disease, paranoid schizophrenia, which played a significant part in the killing. (*Ibid.*) The trial judge found that "'under the right-wrong prong of section 25(b), the defendant would qualify as legally insane; but under the other prong, he clearly does not.'" (*Ibid.*) Concluding that section 25, subdivision (b), requires proof of both prongs to establish insanity, he found "defendant had not established that he was legally insane." (*Ibid.*)

The *Skinner* court noted that the defendant knew the nature and quality of his act, i.e., he knew his act was homicidal, but that he was unable to distinguish right from wrong, i.e., he did not know that this particular killing was wrongful or criminal. (39 Cal.3d at p. 770.) As noted above, *Skinner* adopted the test which requires proof of only one prong of the *M'Naghten* test. As a consequence, the *Skinner* court held that the trial court's finding that the defendant qualified as legally insane under the "right-wrong" prong required reversal with directions to enter a judgment of not guilty by reason of insanity. (*Id.,* at pp. 770, 784.)

In this case, at the conclusion of the sanity phase, the trial court instructed the jury that defendant was insane only if he was incapable of knowing or understanding the nature and quality of his act *and* of distinguishing right from wrong at the time of the offenses. In light of the *Skinner* holding, we must conclude the trial court erred in using the conjunctive rather than the disjunctive test in applying section 25, subdivision (b).

The instant case is unlike *Skinner,* however, in that we have no finding by the trial judge or jury that defendant met either prong of the *M'Naghten* or section 25, subdivision (b), test. Thus, we are not compelled to reverse with directions to enter a judgment of not guilty by reason of insanity, as was the case in *Skinner.* We look next to whether the error could be considered harmless.

In *People* v. *Franco* (1986) 177 Cal.App.3d 422 [222 Cal.Rptr. 903], the Fifth District Court of Appeal held the trial court erred under *Skinner,* having required the defendant meet both prongs of section 25, subdivision (b). However, the *Franco* court held the error harmless, as there the defendant failed to satisfy *either* prong of section 25, subdivision (b). The court stated: "[T]he only evidence before the trial court was that appellant was sane under either and both prongs of section 25, subdivision (b). Since no other conclusion was possible upon the record before the trial court, the inadvertent use of the conjunctive rather than the disjunctive test by the trial court is not reversible error." (177 Cal.App.3d at p. 428.)

This case does not permit a finding of harmless error, as in *Franco;* nor does it compel a reversal with directions to enter a judgment of not guilty by reason of insanity, as in *Skinner.* The instant record contains conflicting evidence which gives rise to conflicting inferences as to whether defendant satisfied either prong of the standard set forth in section 25, subdivision (b). Clearly, it is possible the jury in the sanity phase may have found defendant *insane* under one of the two prongs, but ultimately found him *sane* because he did not satisfy both prongs of section 25, subdivision (b).

Dr. Galioni testified for defendant in the sanity phase of trial and, in his opinion, defendant was suffering from a mental disorder that rendered him incapable of knowing or understanding the nature and quality of his acts and incapable of distinguishing right from wrong. The jury obviously did not believe Dr. Galioni's opinion evidence, at least with respect to *one* of the two prongs, and *possibly both.*

Dr. Galioni opined at one point that defendant was completely out of touch with reality, unable to know right from wrong. Yet, other evidence pointed to defendant's discernment of right and wrong; for example, his statement to police that he did not go to attorney James' residence because he did not want to hurt innocent people reasonably could be interpreted to mean defendant had considered the rights of others.

Based on the conflicting inferences presented by the record, we are unable to conclude as a matter of law that defendant either satisfied or failed to satisfy either prong of section 25, subdivision (b). ▮ The question of insanity is a question of fact for the jury. (*People* v. *Wheeler* (1882) 60 Cal. 581.) *Wheeler* notes: "[The jury] must determine, not only whether the hypothetical case on which [an expert's] opinion is based is the case before them, as established by credible testimony, but must consider the reasons he has given for his opinions, and by the whole testimony test his credibility and the correctness of his judgment." (*Id.*, at p. 583.)

▮ We may reverse the judgment of conviction with directions that a new trial be had only on the issue of insanity. (*People* v. *Marshall* (1930) 209 Cal. 540, 547 [289 P. 629]; 22 Cal.Jur.3d (rev.), Criminal Law, pt. 1, § 3270, p. 23; pt. 2, § 3796, p. 359.) While judgment cannot be pronounced upon the verdicts from the guilt phase of trial until the sanity of defendant has been determined (*People* v. *Eggers* (1947) 30 Cal.2d 676, 691 [185 P.2d 1]), the verdicts on the issue of guilt shall remain nonetheless undisturbed by our reversal here. We have reviewed the issues relating to the guilt phase of trial and found no error therein. The error in the trial of the issue of sanity in this case does not entitle defendant to a new trial on the

issue of guilt. (*Id.*, at p. 691.) We shall reverse the judgment of conviction with directions to retry defendant on the issue of insanity only.

## DISPOSITION

The judgment is reversed and the cause remanded for a new trial solely on the question of insanity. The verdicts from the guilt phase of trial remain hereby undisturbed.

Puglia, P. J., and Carr, J., concurred.