Filed 12/16/14  P. v. Davis CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B252015 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  VA127396) |
| v. | |
| KENDRICK DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge.  Affirmed.

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Nima Razfar, Deputys Attorney General, for Plaintiff and Respondent.

Appellant Kendrick Davis challenges his convictions for murder and attempted murder on the grounds of insufficiency of the evidence and ineffective assistance of counsel. We reject his contentions and affirm.

## RELEVANT PROCEDURAL BACKGROUND

On February 20, 2013, an information was filed charging appellant in count 1 with the murder of Lester Donaldson (Pen. Code, § 187, subd. (a)), in count 2 with the attempted willful, deliberate, and premeditated murder of Matthew George, a peace officer (Pen. Code, §§ 187, subd. (a), 664), and in count 3 with assault upon a peace officer (Pen. Code, § 245, subd. (c)).[1] Accompanying counts 2 and 3 were allegations that appellant inflicted great bodily injury (§ 12022.7, subd. (a)). The information also asserted prior conviction allegations (§ 667.5, subd. (b), § 667, subds. (a), (b)-(i), 1170.12, subds. (a)-(d)). Appellant pleaded not guilty and denied the special allegations.

A jury found appellant guilty as charged and found true the special allegations. At the prosecutor's request, the trial court limited the bench trial to the prior conviction allegations predicated on a single specified conviction. After finding those prior conviction allegations to be true, the trial court sentenced appellant to a total term of 88 years to life. This appeal followed.

---

[1]    All further statutory citations are to the Penal Code.

## FACTS

A. *Prosecution Evidence*

### 1. *Murder of Lester Donaldson (Count 1)*

In 2012, appellant was a parolee assigned to parole agent Maridee Richards. According to Richards, on Friday, October 12, 2012, appellant was released from county jail and appeared at the Long Beach Parole Office, where Richards placed a G.P.S. monitoring device on his ankle. Appellant told Richards that he was residing in a motel in Bellflower.

The following Monday (October 15), at approximately 6:00 a.m., the monitoring center informed Richards that appellant's device had been cut off or removed. Richards and another parole agent went to appellant's motel room, where they found a dead person in the bed. Appellant was not present. A search disclosed appellant's monitoring device in a dumpster near the motel.[2]

The dead person was identified as Lester Donaldson. Dr. Kevin Young, a medical examiner, performed an autopsy on Donaldson's body. According to Young, Donaldson displayed abrasions on the left side of his neck, a broken neck bone, and hemorrhages in his eyes. Young opined that Donaldson died of strangulation. Young further stated that to cause Donaldson's death, it was necessary for the perpetrator to apply constant pressure for "over a minute at least," and perhaps for "minutes."

The jury viewed video recordings from the motel's cameras, which showed appellant leaving the motel at 5:33 a.m. on October 15, 2012.

---

[2] The prosecution called as witnesses Los Angeles County Sheriff's Department Deputy Sheriffs Matthew Hart and Shelby Martin, who accompanied Richards and the other parole agent to appellant's motel room.

3

## 2. *Attempted Murder of, and Assault upon, Long Beach Police Department Officer Matthew George (Counts 2 and 3)*

Thanh Nguyen testified that she owned a nail salon in Long Beach. On October 15, 2012, at approximately 10:00 a.m., appellant entered the salon and asked who owned a red Mercedes parked outside. After the car owner identified herself, appellant inquired whether he could borrow the car. When the car owner replied, "No," appellant left the salon, returned with a soda in his hand, threw it on the salon's floor, and began yelling. Nguyen and her customers fled from the salon. After making a 911 call, Nguyen returned to the salon, where she saw appellant lying on his back on the floor. When Nguyen approached him, he left the salon and went to the Mercedes.

Nguyen further testified that a uniformed police officer soon arrived in a patrol car. Upon leaving the car, the officer ordered appellant to kneel down, but appellant refused. After the officer waved his baton without striking appellant, a fight commenced between appellant and the officer. According to Nguyen, appellant punched the officer, and was "really try[ing] to hurt [him]." When Nguyen yelled for help, five or six construction workers appeared and separated appellant from the officer, who was beneath appellant.

Two cameras outside Nguyen's salon and a cell phone made video recordings of the incident, which were played for the jury; in addition, the prosecution presented evidence that the keys to the Mercedes contained a mace dispenser. The video recordings appeared to show that appellant took the keys to the Mercedes from its owner, who discharged the dispenser at appellant as he robbed her.

Long Beach Police Department Officer Matthew George testified that he responded to an "unknown trouble call" regarding the nail salon. When George arrived at the scene, a woman told him that appellant had taken the keys to her

4

Mercedes. George took out his gun and approached appellant, who was standing in front of the Mercedes with his hands on the hood, and appeared to be "humping" the car's grille. George noticed that appellant was sweating.

George further testified that he directed appellant to walk toward him. Appellant initially obeyed, but failed to lie down on the ground when George ordered him to do so. Appellant said, "Fuck you, no. Let's fight," and ran toward George, who holstered his gun and pulled out his baton. After adopting a boxer's stance, appellant repeatedly punched George in the face with closed fists, and George struck appellant's upper body and hands with the baton. When George tried to back away from appellant, he felt tugging on or near his gun belt. According to George, because appellant appeared to be trying to seize his gun, he was authorized to apply lethal force. George swung his baton against appellant's head, which began to bleed. When appellant continued to fight, George hit appellant's head with the baton more times, with no effect.

George further testified that the fight attracted a crowd of people who yelled at appellant. When appellant momentarily turned to face the crowd, George "somehow" lost his baton. George placed appellant in a bear hug, slammed him to the ground, and straddled appellant while holding his left arm. While the pair were on the ground, George called for backup. Appellant, who lay on his back, reached up with his free right hand and choked George. As George began to lose consciousness, some onlookers came to his assistance and freed him from appellant's grip.

George further testified that after the fight, he felt dazed, tired, and weak. His face was swollen and painful, he had lacerations and red markings on his neck, and his nose was fractured. He later underwent surgery to repair the fracture.

Jose Polanco testified that he was working on a sign near Nguyen's nail salon when appellant walked from the salon to a red Mercedes. Appellant began

5

"humping" the car and screaming. After a police officer told appellant to "go on the ground" and drew a baton, appellant began "swinging" at the officer. When the officer lost his baton, he hugged appellant, and the pair fell to the ground. Polanco saw appellant punch the officer for one or two minutes. As the officer seemed to be in trouble, Polanco and two of his fellow workers took hold of appellant, who continued to struggle against them until other police officers arrived.

Donald Pardew, who operated a business near Nguyen's nail salon, testified that he heard a loud noise and saw appellant beating on the front of a parked Mercedes. A police officer appeared in a patrol car and tried to "tone" appellant "down." After the officer issued some commands that appellant ignored, a fight ensured. According to Pardew, appellant appeared to be the initial aggressor. The officer used a baton to resist appellant. When the officer stepped backwards, he lost his footing, and appellant grabbed the baton. The pair ended up fighting on the ground. Pardew assisted the officer by taking the baton away from appellant. When Pardew saw appellant touching the officer's gun, he put his foot on appellant's arm. Other people joined Pardew in holding appellant until police officers arrived.

Following the incident, investigating officers took DNA samples from George's gun and appellant. Appellant's DNA was found on the gun.

### 3. *Appellant's Post-Arrest Statements*

Los Angeles County Sheriff's Department Homicide Investigator Gary Sloan testified that he and a fellow investigator interviewed appellant following his

6

arrest. After Sloan issued *Miranda* warnings to appellant, appellant voluntarily spoke to the investigators.[3]

Regarding the incident involving Officer George, appellant told the investigators that he was the "sole aggressor" and "the person at fault." Appellant said that he "had no business messing with the women inside" the nail salon, that "he was the person who punched the police officer first," and that the officers "did absolutely nothing wrong when they detained him . . . ." When asked to explain his actions, appellant stated that "he just did not want to go back to jail."

Regarding the incident at the motel, appellant told the investigators that the dead man, Donaldson, was the long-time boyfriend of appellant's mother, who died while he was in custody. Appellant claimed to have had a good relationship with Donaldson. On the date of the incident, appellant invited Donaldson to his motel room, where they "convers[ed] . . . with each other very civilly" and drank approximately half of a bottle of Courvoisier.

Appellant further told the investigators that at some point, he and Donaldson became emotional due to the alcohol, and began discussing how appellant's mother had died. Donaldson spoke respectfully regarding appellant's mother and said that he had done all he could do for her. However, while in custody, appellant had come to believe that Donaldson had not done everything he could to help appellant's sick mother. Thus, when Donaldson spoke of appellant's mother, appellant became "internally enraged." Appellant told the investigators: "It all came to a head, the stress of the monitor, Mom's death, et cetera, et cetera. He wasn't even there for her. I didn't trust him. I was locked up."

Appellant further told the investigators that he grabbed Donaldson, who was on the bed, got on top of him, and squeezed his throat until he stopped breathing.

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

Appellant said, "I choked him. I was drunk. I choked him and I think I did it with my left hand." Appellant described his conduct as "a rage-of-the-moment-type of thing." Appellant then covered Donaldson with a pillow and comforter, left the motel, and cut off his monitoring device.

B. *Defense Evidence*

Appellant presented no evidence.

## DISCUSSION

Appellant contends (1) that his convictions for murder and attempted murder fail for want of substantial evidence, and (2) that his counsel rendered ineffective assistance. As explained below, we disagree.

A. *Adequacy of the Evidence*

We begin with appellant's challenges to the evidentiary showings regarding his convictions for first degree murder and first degree attempted murder.[4]

---

[4] "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

### 1. *Donaldson's Murder*

Appellant maintains that Donaldson's murder was not deliberate and premeditated, arguing that the evidence shows that he killed Donaldson in a fit of rage. Generally, "'"[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]"'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Nonetheless "'"[p]remeditation and deliberation can occur in a brief interval. The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" [Citation.]' [Citations.]" (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069, quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

"The necessary elements of deliberation and premeditation may be inferred from all the facts and circumstances as will furnish a reasonable basis for such inferences, and where the evidence is not in law insufficient, the matter is exclusively a question for the trier of fact to determine. [Citations.] Proof of circumstances occurring at the time of the killing, as well as circumstances before and after the killing, are competent to show deliberation and premeditation. [Citations.]" (*People v. Mulqueen* (1970) 9 Cal.App.3d 532, 544.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our Supreme Court identified three kinds of evidence a reviewing court should consider in determining the existence of premeditation and deliberation, namely, planning activity, motive, and manner of killing.[5] It has subsequently cautioned that these

---

[5]     In *People v. Lenart* (2004) 32 Cal.4th 1107, 1127, the court summarized the three *Anderson* categories as follows: "'(1) facts about how and what defendant did *prior* to

*(Fn. continued on next page.)*

9

factors "are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight. [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

An instructive application of the *Anderson* factors is found in *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*). There, the defendant was charged with three murders committed shortly after he was paroled from state prison. (*Id*. at p. 351.) There were no eyewitnesses to any of the murders. (*Id*. at pp. 352-353.) One of the victims, who died of multiple gunshot wounds, was found on a rural dirt road in the area of one of the defendant's other murders. (*Ibid*.) Regarding that victim, the defendant told investigating officers that he had picked her up while she was hitchhiking, and paid for her food and shelter when she said she had no money. (*Id*. at p. 368.) He further stated he took her with him when he decided to look for the body of his other victim. (*Id*. at p. 369.) According to the defendant, he killed her in a fit of rage when he concluded that she had lied regarding her lack of money. (*Ibid*.)

On appeal, the defendant acknowledged that he intentionally killed the victim, but maintained that the killing was "an impulsive, unplanned act." (*Silva, supra,* 25 Cal.4th at p. 369.) In concluding there was sufficient evidence of

the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'"

10

premeditation and deliberation, our Supreme Court observed that a rational jury was not obliged to accept the defendant's implausible statement that he intended to take a stranger to the site of one of his prior crimes. (25 Cal.4th at p. 369.) The court stated: "A rational trier of fact could infer instead that defendant selected this location because it was a place where no potential witnesses or rescuers could see them or hear [the victim's] cries for help and the sounds of a shotgun firing. . . . Thus, the murder's isolated location, selected by defendant, is itself evidence of planning. Defendant's statements that he believed [the victim] had lied to him about having no money and had taken advantage of him in persuading him to spend his money on her are evidence of motive." (*Ibid*.) The court further concluded that the manner of killing was "entirely consistent with a premeditated and deliberate murder." (*Ibid*.)

Here, appellant concedes that his strangulation of Donaldson demonstrated an intent to kill, but maintains that his act was "grounded in impulse, not . . . preexisting reflection," namely, a fit of rage triggered by Donaldson's remark that he had done everything he could for appellant's mother. (Italics deleted.) However, a rational jury was not required to accept appellant's implausible explanation that he met with Donaldson simply for the purpose of socializing, despite having concluded while in custody that Donaldson had not adequately helped his sick mother. Instead, a rational jury could infer that appellant invited Donaldson to his motel room because it was a place where appellant could confront Donaldson in the absence of onlookers. The murder's private location, coupled with the fact that the invitation to Donaldson followed close on the heels of appellant's release from custody, is evidence of planning. Furthermore, appellant's statements that he believed that Donaldson had failed to help his ailing mother is evidence of motive.

11

Appellant's method of killing was also "entirely consistent" with a premeditated and deliberate murder (*Silva*, *supra*, 25 Cal.4th at p. 369). Manual strangulation is usually sufficient to show an intent to kill (*People v. Hernandez* (1988) 47 Cal.3d 315, 349), and in some circumstances, is evidence of premeditation and deliberation (*People v. Davis* (1995) 10 Cal.4th 463, 491 [defendant's act of manual strangulation demonstrated premeditation and deliberation when the evidence showed that the victim, who was driving with the defendant, wrecked her car and fled from the defendant, who followed and strangled her over a period of up to five minutes]). Here, the manner of killing supports a finding of premeditation and deliberation, as the strangulation hindered Donaldson from crying out or alerting motel residents, and defendant applied constant pressure for "over a minute at least," and perhaps for "minutes."

*People v. Rowland* (1982) 134 Cal.App.3d 1, upon which appellant relies, is distinguishable. There, the defendant met his female victim at a party. (*Id.* at pp. 6, 8.) The pair then drove to the defendant's apartment, where he lived with another woman. (134 Cal.App.3d at pp. 6-7.) The defendant hid the victim, told his roommate that a friend and his "old lady" would be sleeping in a spare room, and then pretended to leave the apartment. (*Ibid.*) After the roommate heard the bed shaking in the spare room and some choking sounds, she fled from the apartment. (*Ibid.*) The victim's body was discovered some distance from the apartment, and the cause of death was determined to be strangulation by a electrical cord. (*Id.* at p. 7.) Applying the *Anderson* factors, the appellate court concluded there was insufficient evidence of premeditation and deliberation to support the defendant's conviction for first degree murder. Because the defendant did not know the victim before meeting her at the party, the court determined that the evidence showed no motive or planning for a murder, but only the defendant's hope for a "sexual interlude" at his apartment. (*Id.* at p. 9.) The court also

12

determined that the method of killing established neither premeditation nor deliberation because electrical cords are commonly found in bedrooms. (*Id*. at p. 8.) In contrast, as explained above, appellant's pre-existing relationship with Donaldson, coupled with the circumstances and manner of the killing, are sufficient to support a finding of premeditation and deliberation.

### 2. *Attempted Murder of Officer George*

We turn to appellant's contentions regarding his conviction for the attempted first degree murder of Officer George.

### a. *Intent to Kill*

Appellant maintains there is no evidence that he intended to kill Officer George. Generally, "[t]he crime of attempted murder includes the element of intent to kill. [Citation.] 'One who intentionally attempts to kill another does not often declare his state of mind . . . . Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. . . . [Citation.]'" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552, quoting *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

Here, the record shows that following Donaldson's murder, appellant cut off his G.P.S. monitor, saw the Mercedes parked outside Nguyen's nail salon, identified its owner, and took the keys to the Mercedes. When Officer George arrived, appellant initially cooperated with his orders, then attacked him. There is evidence that appellant took control of George's baton and tried to seize his gun: Pardew saw George's baton in appellant's hands, and appellant's DNA was found on George's gun. Furthermore, appellant choked George with force sufficient to

13

cause George to begin to lose consciousness. Following the incident, appellant stated that he attacked George because "he just did not want to go back to jail."

Appellant's post-arrest remarks, coupled with his conduct, support the reasonable inference that he intended to kill Officer George in order to escape. Aside from repeatedly hitting George in the face with closed fists, appellant successfully seized George's baton, attempted to grab his gun, and sought to strangle him. The testimony of spectators and George's injuries establish the ferocity of appellant's attack. Nguyen testified that appellant was "really try[ing] to hurt [George]," and Pardew testified that George appeared to be "losing the fight." George suffered a fractured nose and lacerations to his neck. On this evidence, a rational jury could conclude that appellant acted with the intent to kill.[6]

b. *Premeditation and Deliberation*

Appellant also contends there is no evidence of premeditation and deliberation. Generally, the terms "'premeditated'" and "'deliberate,'" as applied in the context of attempted murder, carry the same meaning they convey in connection with first degree murder. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, overruled on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.) As explained above (see pt. A.1., *ante*), the presence of

---

[6] Appellant suggests that he lacked the mental state required for attempted first degree murder because Officer George saw him "humping" the front of the Mercedes and sweating. However, a rational jury was not compelled to infer from that behavior that appellant was then "mentally unstable or under the influence . . . ." The record discloses evidence that the keys to the Mercedes contained a mace dispenser that the Mercedes owner discharged at appellant when he seized the keys. In view of that evidence, the jury could reasonably infer that appellant's behavior was a response to the owner's use of the mace dispenser.

14

premeditation and deliberation is determined by whether appellant adequately reflected on killing Officer George, not by how long he contemplated that conduct.

We find guidance regarding appellant's contention from *People v. Robillard* (1960) 55 Cal.2d 88 (*Robillard*), overruled on other grounds in *People v. Satchell* (1971) 6 Cal.3d 28, 35, 43, and from *People v. Sedeno* (1974) 10 Cal.3d 703 (*Sedeno*), overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89, *People v. Breverman* (1998) 19 Cal.4th 142, 149, and *People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12).  In *Robillard*, the defendant, who was on probation, looted some cars and drove away in a stolen car.  (55 Cal.2d at p. 92.)  A police officer unaware of the crimes stopped the defendant and placed radio calls audible to the defendant regarding the defendant's car.  (*Ibid.*)  The officer was later found dead after having been shot.  (*Id*. at p. 93.)  In affirming the defendant's conviction for first degree murder, our Supreme Court concluded there was a sufficient showing of premeditation and deliberation, as there was evidence that the defendant had a gun when he was stopped, and knew that the officer's radio calls subjected him to imminent arrest.

In *Sedeno*, the defendant was a jail prisoner who seized an opportunity to escape on foot.  (*Sedeno, supra*, 10 Cal.3d at p. 710.)  When officers chased him, he fought them off and continued to flee, even though they told him that he would not be hurt if he gave up.  (*Ibid*.)  The defendant took a gun from an officer and fired it at his pursuers, killing one of them.  (*Id*. at pp. 710-711.)  After the defendant was convicted of first degree murder, the Supreme Court rejected his contention there was insufficient evidence of deliberation, stating:  "[The defendant] had been stopped by police officers while fleeing from the jail.  He had been advised to surrender and had been assured that he would not be hurt.  He nonetheless attempted to continue his flight and . . . seized the officer's gun and . . . shot the officer in the back."  (*Id*. at pp. 712-713.)

15

In view of *Robillard* and *Sedeno*, the record adequately supports the jury's findings of premeditation and deliberation. There is sufficient evidence of planning, as the record shows that when Officer George arrived, appellant first obeyed his orders, which permitted appellant to move toward George. Although George's conduct clearly informed appellant that he would be safe if he complied with the orders, appellant attacked him. Regarding the remaining *Anderson* factors, appellant's statement that he "just did not want to go back to jail" is sufficient evidence of motive, and his persistent efforts to seize George's weapons and strangle him are fully consistent with a premeditated and deliberated plan to kill George in order to escape. On this record, a rational jury could find the existence of premeditation and deliberation. In sum, there is sufficient evidence to support appellant's convictions for murder and attempted murder.

## B. *Ineffective Assistance of Counsel*

Appellant contends his trial counsel rendered ineffective assistance by failing to (1) request an instruction on voluntary intoxication, and (2) object to a portion of the prosecutor's closing arguments. For the reasons explained below, we reject these contentions.

### 1. *Governing Principles*

"In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

16

probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357.)

### 2. *Voluntary Intoxication Instruction*

Appellant contends that his defense counsel's performance was deficient because he requested no instruction regarding voluntary intoxication. Appellant argued that in view of his post-arrest statements to investigators, it was incumbent upon counsel to request such an instruction. We disagree.

As elaborated below (see pt. B.3, *post*), in closing argument, defense counsel relied on appellant's post-arrest statements to support a theory of "heat of passion" voluntary manslaughter. Counsel maintained that Donaldson's remarks regarding appellant's mother were sufficiently provocative to cause an ordinary reasonable person to become "internally enraged" and act out of emotion, rather than judgment. Counsel argued: "Your mother died while you were in prison, you just get out of prison, you invite her boyfriend to your room. [You] guys are having a good time. You are getting some liquor, you are having some beer [*sic*], you are feeling good and . . . all you keep hearing about is your mother and how she died . . . . You are going back and forth, 'Well, you didn't do enough for my mom.['] . . . ['] Maybe it's all your fault too.' And it just keeps going on and on and on. [¶] Would an ordinary person be getting emotional and crying after losing his mother, not being able to go to the funeral because he was in prison? Would an ordinarily[] reasonable person become internally enraged . . . ?"

We conclude that appellant's counsel did not render ineffective assistance by not requesting an instruction on voluntary intoxication. "Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.) As explained, the record discloses no evidence sufficient to support a voluntary intoxication instruction.

"'[A] defendant has a right to an instruction that pinpoints the theory of the defense [citations]; however, a trial judge must only give those instructions which are supported by substantial evidence.  [Citations.]  Further, a trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'  [Citation]  'A party is not entitled to an instruction on a theory for which there is no supporting evidence.'  [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 715 (*Roldan*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Generally, "[e]vidence of voluntary intoxication . . . is 'admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.'  [Citations.]" (*Roldan, supra,* 35 Cal.4th at p. 715.)  Accordingly, a defendant charged with first degree murder is entitled to an instruction on voluntary intoxication only when there is substantial evidence that the defendant was voluntarily intoxicated and that the intoxication affected the "'actual formation of [the] specific intent'" required for that crime.  (*Ibid.,* quoting *People v. Williams* (1997) 16 Cal.4th 635, 677-678 (*Williams*).)

Under these principles, evidence of the defendant's potential intoxication, unaccompanied by sufficient evidence regarding its effect on the defendant's mental state, does not support voluntary intoxication instructions.  In *Williams*, the defendant was convicted of four counts of first degree murder.  (*Williams, supra*, 16 Cal.4th at p. 647.)  On appeal, he contended the trial court erroneously refused his request for an instruction on voluntary intoxication, pointing to witness testimony that when he shot the four victims, he was "'probably spaced out,'" as well as his own post-arrest statements that he was "'doped up'" and "'smokin' pretty tough'" at the time of the killings.  (*Id*. at p. 676.)  In rejecting the contention, the Supreme Court concluded "there was no evidence at all that

18

voluntary intoxication had any effect on [the] defendant's ability to formulate intent." (*Id.* at p. 678.)

The same is true here. The sole evidence regarding appellant's potential voluntary intoxication is found in his post-arrest remarks. Appellant told the investigators that after he and Donaldson jointly drank approximately half of a bottle of Courvoisier, they "became emotional," and "started speaking about [appellant's] mother's death and how she died." According to appellant, although Donaldson made only respectful remarks regarding appellant's mother, appellant became "internally enraged" after Donaldson said that he "did everything he could do for [appellant's] sick mother," and began to choke Donaldson. In describing Donaldson's strangulation, appellant said, "I choked him. I was drunk."

Appellant's post-arrest statements do not constitute substantial evidence that his voluntary intoxication had any effect on the "'actual formation of [the] specific intent'" required for first degree murder (*Roldan*, *supra*, 35 Cal.4th at p. 715; *Williams*, *supra*, 16 Cal.4th at pp. 677-678). In explaining why Donaldson's remarks precipitated the killing, appellant did not mention his purported intoxication. Appellant told the investigators: "It all came to a head, the stress of the monitor, Mom's death, et cetera, et cetera. He wasn't even there for her. I didn't trust him. I was locked up." Furthermore, as appellant claimed to recall the precise events surrounding Donaldson's death, his remarks do not support the reasonable inference that his level of intoxication affected the formation of the requisite state of mind. (See *People v. Juarez* (1968) 258 Cal.App.2d 349, 357 [defendant's "clear account" of killing showed that his intoxication did not prevent the formation of the mental state required for first degree murder].) Accordingly,

19

appellant has failed to show ineffective assistance of counsel, as he was not entitled to a voluntary intoxication instruction.[7]

### 3. *Prosecutor's Closing Argument*

Appellant also contends his trial counsel rendered ineffective assistance by failing to object, during the rebuttal portion of the prosecutor's closing argument, to erroneous remarks regarding the "heat of passion" required for voluntary manslaughter. As explained below, appellant's contention fails.

Voluntary manslaughter based on a sudden quarrel or heat of passion is a lesser included offence of intentional murder. (*People v. Breverman, supra,* 19 Cal.4th at pp. 153-154, 160.) The factor that distinguishes murder from voluntary manslaughter based on a sudden quarrel or heat of passion is provocation. (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) The requisite provocation is subject to several requirements. (*Ibid*.) The provocation must be caused by the victim, or reasonably attributed to the victim by the defendant. (*Ibid*.) Furthermore, although the provocative conduct may be physical or verbal, it "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id*. at p. 584.) The provocation is thus assessed under subjective and objective standards: it must actually motivate the defendant's conduct, and also be capable of arousing the passions of a "'reasonable person.'" (*Ibid*.)

---

[7] Appellant suggests that counsel improperly failed to request a voluntary intoxication instruction in connection with the attempted murder of Officer George. That contention fails, as there was insufficient evidence to support such an instruction in connection with Donaldson's murder, which occurred over four hours before the attempted murder of George. Furthermore, the record discloses no other evidence that appellant was intoxicated when he tried to kill George; on the contrary, George testified that he smelled no alcohol on appellant.

In *People v. Beltran* (2013) 56 Cal.4th 935, 946-953 (*Beltran*), our Supreme Court clarified that the inquiry into the existence of the requisite provocation is directed at the defendant's state of mind, not his or her conduct. There, the court rejected a contention that "the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill." (*Id*. at p. 946.) The court explained: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id*. at p. 949.)

Here, the jury was instructed with CALJIC No. 8.42, which states in pertinent part: "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. . . . [¶] The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than judgment. [¶] If there was provocation, . . . , but of a nature not normally sufficient to arouse passion, . . . , and if an unlawful killing of a human being followed the provocation and had all the elements of murder, . . . ,

21

the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

During closing arguments, defense counsel maintained that under the standards set forth in CALJIC No. 8.42, it was "not far fetched" that an ordinarily reasonable person in appellant's circumstances would have become "internally enraged" upon hearing Donaldson's remarks regarding the death of appellant's mother. In the rebuttal portion of closing argument, the prosecutor stated: "You are reasonable people. That's why we have you here. So I ask you, would saying, 'I did everything I could for her,' [--] speaking of your mother [--] . . . *cause you to kill someone?* Because that is what it's going to take for that to apply." (Italics added.) Later, the prosecutor added: "If you think those word are so inflammatory[] that it would *cause you to kill* the person who took care of your mom, then go ahead and come back with a [verdict of] voluntary manslaughter . . . ." (Italics added.) Defense counsel asserted no objection to those remarks.

It is unnecessary for us to assess whether defense counsel's failure to object constituted deficient representation, as the record discloses no prejudice to appellant attributable to the prosecutor's remarks. In *People v. Najera* (2006) 138 Cal.App.4th 212, 215-216 (*Najera*), the defendant and his victim were drinking beer and socializing when the victim began calling the defendant a "'jota'" -- that is, a "'faggot.'" After the defendant initiated a fist fight with the victim, the defendant retrieved a knife and killed the victim with it. (*Id*. at p. 216.) On appeal, the defendant challenged his conviction for second degree murder, arguing that his counsel was ineffective by failing to object to the prosecutor's remarks in closing argument regarding "heat of passion" voluntary manslaughter, including that the requisite provocation must be sufficient to arouse a reasonable person to kill. (*Id*. at pp. 224-226.) The appellate court held that defense counsel's failure to

22

object caused no prejudice to appellant because he was, in fact, *not* entitled to an instruction on "'heat of passion'" voluntary manslaughter, concluding that taunts such as "'faggot'" and "'"motherfucker,"'" as a matter of law, do not constitute adequate provocation. (*Id.* at pp. 225-226.) The court explained: "'"A provocation of slight and trifling character, such as words of reproach, however grievous they may be, . . . is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter."'" (*Id.* at p. 226, quoting *People v. Wells* (1938) 10 Cal.2d 610, 623, overruled on another ground in *People v. Holt* (1944) 25 Cal.2d 59, 87-88.)

The rationale in *Najera* is applicable here. According to appellant's post-arrest remarks, within days of his release from custody, he invited Donaldson to his motel room for socializing, even though while in custody he had concluded that Donaldson had not adequately helped his ailing mother. Indeed, appellant told the investigating officers, "I didn't trust [Donaldson]." The only "provocation" that appellant attributed to Donaldson were respectful remarks regarding appellant's mother, coupled with Donaldson's claim that he had done everything he could to help her. Under the circumstances, those remarks were insufficient as a matter of law to cause an emotion "so intense" that an ordinary reasonable person "would simply *react*, without reflection" (*Beltran*, *supra*, 56 Cal.4th at pp. 949, 951), for purposes of reducing murder to manslaughter.

Pointing to *People v. McCowan* (1986) 182 Cal.App.3d 1, appellant contends the prosecutor's remarks must be viewed as prejudicial. There, the defendant and his wife underwent a lengthy and bitter divorce. (*Id.* at pp. 7-8.) After the divorce, he killed his former wife, wounded his ex-mother-in law, who had lived with the couple during their dissolution proceedings, and killed his ex-father-in-law. (*Ibid.*) At trial, the defendant presented evidence that on the day of the shootings, his divorce and other problems "had been more than he could bear."

23

(*Id*. at p. 8.) According to the defendant, he killed his wife after she made an obscene gesture at him and appeared to reach for something in her car; he then shot his former parents-in-law while consumed by hatred for them. (*Ibid*.) The appellate court concluded that on this evidence, the trial court had properly instructed the jury regarding "heat of passion" voluntary manslaughter. (*Id*. at pp. 15-16.)

Here, in contrast, there is no evidence of provocation sufficient to support a "heat of passion" voluntary manslaughter instruction. By appellant's own account, prior to the remarks by Donaldson that purportedly triggered the killing, appellant's dealings with Donaldson were not acrimonious; on the contrary, appellant told investigators that he had a good relationship with Donaldson, and that on the date of the incident, appellant "convers[ed] . . . with each other very civilly." Accordingly, Donaldson's remarks cannot be regarded as provocation sufficient to reduce murder to voluntary manslaughter.

Furthermore, even if Donaldson's remarks were legally sufficient to support a "heat of passion" voluntary manslaughter instruction, we would conclude that appellant has shown no prejudice from his counsel's failure to seek a curative admonition regarding the prosecutor's argument. The evidence of provocation was weak, and as explained above (see pt. A.1., *ante*), the record discloses considerable evidence that Donaldson's murder was premeditated and deliberate. Accordingly, there is no reasonable probability of a more favorable outcome for appellant had the jury been admonished that the "proper focus" of an inquiry into provocation is "on the defendant's state of mind, not on his particular act" (*Beltran*, *supra*, 56 Cal.4th at p. 949). In sum, appellant has failed to show that his counsel rendered ineffective assistance by failing to object to the prosecutor's remarks. .

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.