Filed 6/10/16  P. v. Marroquin CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>FROILAN MARROQUIN,<br><br>        Defendant and Appellant. | A142311<br><br><br>(San Francisco County<br>Super. Ct. No. SCN211373) |

## INTRODUCTION

A jury convicted defendant Froilan Marroquin of second degree murder.  A defense psychiatrist testified defendant suffered from posttraumatic stress disorder (PTSD), alcoholism, and mild mental retardation, and as result of one or more of these conditions, it is possible defendant was so intoxicated he was unconscious at the time the victim was killed.  On appeal, defendant argues the trial court committed reversible error by unduly restricting the defense psychiatrist's testimony about his mental state.  We disagree.  He also requests we review the in camera transcripts of the prosecution's *Pitchess* motions (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)) for *Brady* material (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)).  We deem that request waived.  We will affirm the judgment.

**STATEMENT OF THE CASE**

The San Francisco District Attorney charged defendant Froilan Marroquin with the murder of Nestor San Juan on September 11, 2008. (Pen. Code, § 187)[1] Following defense counsel's declaration of doubt as to defendant's competence to stand trial, criminal proceedings were suspended. On February 13, 2014, a jury found defendant presently competent to stand trial.

Criminal proceedings resumed and, on June 3, 2014, a different jury acquitted defendant of first degree murder but found him guilty of second degree murder. He was sentenced to state prison for 15 years to life. This timely appeal follows.

**STATEMENT OF FACTS**

On September 11, 2008, San Francisco police discovered a trash bag containing the remains of 73-year-old Nestor San Juan in a large dumpster located in the basement of 520 Taylor Street, the apartment building where he lived. Cause of death was ligature strangulation with blunt force trauma. Internal hemorrhaging indicated a significant amount of force was applied to compress the neck. Twenty-seven bruises or contusions on the chest, arms, both hands, legs, feet and back of the neck, as well as internal injuries causing internal hemorrhaging and fractures of the ribs and spinal column, were inflicted while Mr. San Juan was alive. The blunt force trauma alone could have caused death. Mr. San Juan did not die of a heart attack.

*Discovery of the Body*

Arturo Romero and defendant met at a drug and alcohol program.[2] They had been friends for a year when defendant invited Arturo to his apartment for lunch. Romero had to step over a bag to enter the first floor apartment. Defendant asked Romero to help him take the bag down to the garbage can in the basement. Romero asked defendant why the

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] Romero was unavailable to testify at trial, having been deported to Honduras. Instead, his preliminary hearing testimony was read to the jury.

2

bag was so heavy; defendant said it contained a vicious dog he killed. Romero became alarmed and "really scared" when he realized his pants were soaked with blood that smelled human. Romero stopped twice, but continued helping both times after defendant cursed him and became enraged. Romero could feel "slim arms" inside the bag, but decided it would not be wise to press defendant on what was in the bag. After they returned to the apartment, defendant handed Romero a towel and told him to clean the blood off the stairs. Instead, Romero went back to the basement to investigate the bag. He put his hand inside the bag and felt a hand with a gold bracelet on the wrist. He went back to the apartment, told defendant not to worry about lunch, and got "out of there, like a rocket." Romero ran to his therapist's office.

Romero arrived at his therapist's office at 11:00 a.m. Romero was distraught, crying uncontrollably, and had blood spattered all over his pants. Romero said he had been asked to carry the body of a woman who had been murdered. The woman's hand had a ring on it and looked as if it had been skinned like a pig. The therapist called the police, and accompanied the responding police officer and Romero to the basement of defendant's building.

The basement steps were covered in blood. Officer Ciudad opened the lid of the trash bin, saw a human hand, opened the trash bag with the help of another officer and saw a deceased body. He called for backup. Romero then pointed out apartment 106 to the officer.

Police learned from neighbor Stephanie Johnson that the apartment belonged to Nestor San Juan. He had lived there for over 20 years. Defendant visited him frequently.

At 5:30 a.m. the previous day, September 10, Ms. Johnson noticed that Nestor's door was slightly ajar. When she tried to nudge the door open further to let Nestor know his door was ajar, she was unable to do so because defendant was standing inside the apartment right behind the door. He appeared flushed, his eyes were red and bloodshot,

and he "stank of booze." It was not unusual for defendant to smell of alcohol at 5:30 a.m., or "any time of day, actually." He was not usually coherent when she saw him.

*Video Surveillance Evidence*

Video surveillance tapes were recovered from 520 Taylor Street. Excerpts showing movements in the first floor hallway near apartment 106, from 10:52:33 p.m. on September 9 through 12:16:15 p.m. on September 11, were played for the jury. On September 9, 2008, Mr. San Juan entered his apartment for the last time at 11:13 p.m. Defendant entered the apartment 10 minutes later, and left the apartment 15 minutes after that.

Defendant returned to the apartment shortly after midnight on September 10 and left again at 2:45 a.m. Defendant returned to the apartment at 4:00 a.m. At 5:25 a.m., Johnson, the neighbor, approached Mr. San Juan's doorway. Defendant left at 7:58 a.m. and returned a few minutes later.

At 6:25 p.m., defendant left the apartment and returned 20 minutes later. At 6:51 p.m., defendant attempted to drag a trash bag through the hallway but then abandoned the effort and returned to the apartment. A few minutes later, he was wiping the hallway floor with a towel.

On September 11, 2008, at 11:00 a.m., defendant and Romero dragged a large plastic bag down the hallway to the basement.

*Additional Forensic Evidence*

There were no signs of forced entry into Mr. San Juan's apartment. Defendant's fingerprints were found there, as well as on the garbage bag containing the body. There was blood on the floor, floorboard, door frame and wall near the doorframe of Mr. San Juan's apartment, and a blood trail through the entryway. Some of the blood looked as if it had been wiped, or had some object dragged through it. DNA testing confirmed Mr. San Juan's blood was on the doorway between the living room and bedroom and on the hallway floor. A swab from the kitchen floor contained defendant's DNA, although it

4

was not blood.  A garbage bag filled with 11 beer bottles was found in the kitchen.  Eight more beer bottles and cans were found inside a Rite Aid bag located inside the bag containing the body.  Defendant's fingerprints were found on three of the beer bottles and one beer can in the Rite Aid bag.

Defendant was arrested at his brother's house on September 12, 2008.  Police found a pint of vodka on his person, and Mr. San Juan's social security card in his wallet.

*Defendant's Statement to Police*

Inspectors Cagney, Gaynor and Casillas questioned defendant later that night for over an hour.[3]  Defendant told police he met Nestor San Juan, his one friend, in 1994 when they both worked at the MacArthur Park restaurant, he as a cook and Nestor as bookkeeper.  He said he had no fights or arguments with Nestor, who was a very good person, a very nice guy; they were very close.  At one time he lived with Nestor at 520 Taylor Street.  For the first half hour of the interview defendant maintained he had spent every night at his brother's house, including the previous night and the night before that, since separating from his wife three months earlier.  He said he had last seen Nestor one month earlier.  Defendant professed not to know why the video camera inside 520 Taylor would have a picture of him the previous night.

The police eventually told defendant Nestor was dead, they had found his body, and they had defendant on video carrying a plastic bag with another person and putting it in a garbage can.  Defendant said he had no idea what happened to Nestor.  He denied knowing if Nestor had an accident.  When asked if Nestor had a heart attack or got sick, defendant stated Nestor said he was sick, and had a heart problem, but defendant still maintained he was not at Nestor's place the day before.  When Cagney pressed him

---

[3] The first 25 minutes of the interview were recorded in both audio and visual modes.  At that point, the battery for the video recorder drained, and the remaining hour and 16 minutes of the interrogation were recorded in audio only.  Both segments of the recordings were played for the jury.  The jury was also provided with a verbatim transcript of the entire interrogation.

5

further, defendant admitted he saw Nestor have a heart attack. When Cagney suggested he got scared, defendant said, "Yeah, I got so scared." Defendant maintained this happened two days earlier, not the day before. They were eating, Nestor said he felt bad, he started shaking and then he fell down in the living room. Defendant did not call 911 because he was so scared. Nestor did not knock over any furniture. Defendant thought Nestor had blood coming from his nose or mouth. Defendant waited for Nestor to wake up for "[m]aybe one hour" and then left the apartment. Defendant demonstrated Nestor's posture on the ground: a little bit on the side, holding his heart. Nestor had no clothes on because he had just stepped out of the shower. Defendant insisted repeatedly this occurred on Wednesday, and any videos that showed him at Nestor's the day before must be wrong. After leaving Nestor's place, defendant went to his brother's house and spent Thursday with him.

At this point, the police told defendant Nestor had not died of a heart attack; something else happened and defendant knew what it was. Defendant said he had no idea what happened. Cagney then posited that Nestor "has a heart attack you think Wednesday and then Thursday you go back you don't know what to do so you, you think maybe to get him out of the apartment so you got to take him downstairs. You put him in the bag, you take him downstairs cause you don't want Nestor laying on the floor. Nestor's dead." Gaynor asked, "Is that what happened?" Defendant said he had no idea.

Next, the police told defendant he was a good man, but he needed "to tell the truth about what happened" or his wife and daughter and brother would think he was a bad man who killed for no reason. Defendant said he put Nestor in the trash can on Wednesday because he was so scared he panicked. He found the garbage bag inside the place. He went outside; he called an old guy from Honduras he had known for a year. Defendant also said he saw the man on the street and said to him, "Oh, can you help me please, you know?" He told his friend to help him take out the trash. He felt so bad he did not know what to say. He did not tell his friend what was in the bag. They carried

6

the bag to the trash can.  He insisted again this occurred on Wednesday, not the previous day.

Cagney reiterated Nestor had a heart attack and asked what time defendant took Nestor downstairs.  Defendant said he did not remember what time it was, but repeated that Nestor had no clothes on.  He had just come out from the shower and was shaking.  He asked defendant to help him.  Three or four months earlier, Nestor had been shaking and could not stand; that time defendant had taken him to Kaiser on Geary.  This time, Nestor "was completely out."  Defendant waited an hour, tried to wake him.  Defendant was so nervous and shaking he called his Honduran friend from his cell phone.

Asked if his memory for what happened was very good "right now," defendant said it was, but there were too many questions and he got lost.  Defendant repeatedly told the police after this point, "You can arrest me."  Asked if Nestor did something to make defendant mad, defendant said, "No, no, no.  I, I don't know."  He said repeatedly he had no idea what happened to Nestor, other than he had a heart attack.  Told by police the videotape showed Nestor was not naked in the trash bag, but had a shirt on, defendant said, "No," and he did not know how that happened.

All he did was shake Nestor when he did not wake up; he thought Nestor was dead and called his friend, and they put the body downstairs.  He put the body in the bag; his friend was in the kitchen and did not know.  At first, defendant said he told his friend it was trash; then defendant admitted he told his friend it was a dog, because the friend saw "a little black, coming out . . ." and asked what it was.  Nestor was already in the shower when defendant arrived on Wednesday and let himself into Nestor's apartment with a key.  They did not talk because Nestor was already sick and shaking.  There was no fight or argument.

When police told defendant that "one mistake . . . doesn't make you a bad person," and he made a big one, defendant admitted he knew he made a "big mistake."  When pressed about what the mistake was, he said, " I don't know, you say I made a big

7

mistake. Okay." He did not call 911 because he was scared, and he did not take Nestor to the hospital like he did the last time because the last time, Nestor could say, "Oh, I feel bad." This time, Nestor could not talk. To the end of the interrogation, defendant maintained that all he did was put Nestor's body in a bag and take him downstairs. He had "no idea" what happened to Nestor.

**Defense Case**

The parties stipulated: "The Salvadoran civil war was a conflict between the military-led government of El Salvador and the Farabundo Martí National Liberation Front, F.M.L.N., a collation of five left-wing militias. [¶] The civil war lasted for twelve years, 1980 through 1992, and violence was seen from both sides. [¶] An unknown number of people disappeared during the conflict. And the U.N. reports that more than 75,000 were killed, including civilians. [¶] Both military and civilian personnel were targeted by both sides of the conflict."

María Marroquin, defendant's older sister, testified about defendant's childhood in El Salvador during the war. They lived in a small village with no school. Their house had no electricity or running water, and they had very little food. Their father worked in the sugar cane fields. He often beat defendant with a whip. Sometimes, his father would beat him so severely the neighbors would tell him to stop.

Defendant witnessed many killings by guerrillas, including the killing of an entire family of eight people. His father's job was to bury the dead, and defendant often helped him. Death squads often came into their village, and defendant's father was taken away more than once. Defendant would become more upset by this than his siblings, yelling, "Don't kill him." Defendant's father would be beaten before returning to the village.

Defendant often climbed trees to avoid violence. He fell from the trees several times, losing consciousness for several hours. He also lost consciousness after falling off a pig and a horse. Defendant left El Salvador for the United States when he was a teenager, after the war ended.

8

Psychiatrist Laura Davies testified as a defense expert on PTSD, alcoholism and its effects on the human brain, and the effects of trauma on the human brain. In 2011, she was retained to evaluate defendant in the areas of neuropsychology, PTSD and the effects of alcohol on behavior and on consciousness. Since 2011, Dr. Davies has interviewed defendant in Spanish four times, for a total of eight hours while he was in custody. She also spoke to defendant's sister Maria and to Mr. San Juan's grandnephew, Chris Sarmiento, who knew defendant before 2008. She also reviewed records of defendant's prior hospitalizations, evaluations of defendant by other mental health professionals, including Drs. Jeko and French, police reports and defendant's statement to the police, and administered several tests.

Defendant told her he fell from a tree, a horse and a pig. He recalled once he fell down, lost consciousness and a lady took him home. He also told her he lost his job at MacArthur Park restaurant multiple times because of his drinking. She wrote a report of her findings dated April 7, 2014.

Dr. Davies also reviewed a report by Dr. Weinstein, a psychologist, who gave defendant an intelligence quotient (IQ) test. Based on that testing, defendant's IQ measured between 61 and 71, which is significantly below average. Defendant's history of losing consciousness as a child would certainly have contributed to his cognitive impairments. For people with IQs below 85, it is harder to learn and understand the consequences of their actions. "[L]ife is not as clear as it is for those of us with average intelligence."

Dr. Davies diagnosed defendant with PTSD based on his symptoms, her evaluation of him, testing, medical records she reviewed, and her discussions with defendant's sister and Mr. San Juan's grandnephew. Her opinion encompassed what she had learned about defendant growing up in El Salvador and the parental beatings he endured. Defendant exhibited all of the symptoms of PTSD, including avoidance of talking about the trauma, intrusive and intense memories of the trauma in flashbacks and

9

nightmares, negative cognitions such as very low self-esteem and feeling very guilty about his failings as a father, and hypervigilance, manifested by sleeping in a closet for personal safety reasons. Defendant also has a lot of somatic problems, such as headaches and stomachaches, feeling isolated and alone, even when he is with other people. Finally, he has a history of hospitalization for hearing voices call his name, a very specific phenomenon in PTSD. Dr. Davies noted defendant's prior eight-day hospitalization followed by a week-long stay at an acute diversion clinic was key to her diagnoses of PTSD and alcohol abuse.

In Dr. Davies' opinion, based on the tests she administered, her eight hours of interviews and the corroboration of things he told her, defendant was not malingering or feigning low I.Q.

In connection with PTSD, dissociation arises when a person feels completely separated from reality and is not mentally connected to where he is physically. The phenomenon of dissociation has been well documented for over 115 years. After consuming alcohol, people can have complete blackouts where they remember nothing, or fragmentary blackouts where they can be cued to remember certain things. "[P]eople can do a lot of stuff and not remember it." They can do very complex activities, and "[n]ot only are they not aware that they're doing it, but they're not able to lay down memories." Dr. Davies answered "[y]es" when asked if a person diagnosed with PTSD could be in a dissociative state when he moved a body by himself, as defendant did in the videotape.

By multiple reports, defendant also has a long and well-documented history of intractable alcohol abuse. Alcohol prevents the growth of neurons and neuroconnections and it also destroys the neural connections that have already been developed. According to both defendant and his sister, defendant began using alcohol at age 11. Alcohol abuse during the formative years also impairs brain function. Alcohol prevents some people from encoding memories when they drink over time.

10

In Dr. Davies' opinion, PTSD sufferers will self-medicate with drugs or alcohol to avoid experiencing intrusive memories, and feeling anxious, guilty, and hypervigilant. They will do anything to dull those sensations.

Stephanie Johnson's observations of defendant in the early morning hours of September 10, 2008, as well as her comment that defendant was often not "coherent" are consistent with someone who was acutely intoxicated. This evidence bolstered Davies' opinion, based on multiple sources and medical records, that defendant "was not a casual drunk, but . . . drank, . . . as part of his PTSD, . . . to become unaware. He drank to get drunk. He wouldn't drink one or two drinks; he would drink and drink and drink and drink."

Dr. Davies testified that there are "numerous, numerous cases in the literature of people becoming unconscious from drinking too much alcohol, [yet] performing complex tasks, seeming to be conscious, interacting with people, answering questions, and having absolutely no recollection the next day." Based on all of the information that she reviewed, Dr. Davies opined it is definitely possible defendant was unconscious, in a blacked out stage, the night Nestor San Juan was killed. She also opined defendant does not remember how Mr. San Juan was killed. Defendant's PTSD, alcohol abuse and cognitive deficits, in combination, affected defendant's behavior and may have caused him to be unconscious on September 10 and 11, 2008.

*People's Rebuttal Evidence*

Psychologist Lisa Jeko testified as an expert in clinical and forensic psychology and PTSD. Dr. Jeko was appointed by the court to assess defendant's then present mental condition in 2012 and 2013. She spoke to defendant twice and wrote two reports. Defendant told her he "drank all the time." He sometimes also used cocaine and marijuana. He drank alcohol to tranquilize himself and alleviate his symptoms of anxiety and stress. Defendant denied he blacked out from drinking around the general time frame of "the incident" in a "global" sense.

11

Dr. Jeko described PTSD and dissociation. She doubted she would make a PTSD diagnosis in this case. Contrary to Dr. Davies, Dr. Jeko opined that a person in a dissociative state can remember what happened while he or she was in this state, even though it may take some prompting. She believed it was possible to engage in complex or goal-directed behaviors, and be aware of one's actions or the nature of those actions, while in a dissociated state. Dr. Jeko testified it was possible—because anything is possible—that defendant was in an unconscious state at the time Mr. San Juan was killed. However, she believed there was not enough information to make a determination one way or the other. She did think there was enough information to conclude defendant was under the influence of alcohol at the time of the offense: he admitted to her he had been drinking, and there was a witness who smelled alcohol. There is a level of intoxication where people are ambulatory but unaware of their behavior. However, it was also possible to be aware at the time and yet not be able to recall the events later. The fact that defendant wiped up the blood indicated defendant was oriented as to time, place and circumstances and increased the possibility of being in a conscious state.

Psychologist Jonathan French testified as an expert in psychology. He interviewed defendant once, in 2012, but recently reviewed his materials with an eye towards determining defendant's potential mental state in September 2008. To Dr. French, "unconscious begins to mean that you are unable to engage in adaptive behavior; so that if there's some need to change your behavior in the middle of being unconscious, you're not going to be able to do that because you're not sufficiently aware of your surroundings to do that." However, a person in an unconscious state can do very simple, repetitive acts, "[b]ut their awareness of those acts may be limited or practically nonexistent." A "blackout" is a memory phenomenon that sheds no light on the person's state of mind. A seasoned drinker with liver dysfunction may be capable of conscious, organized behavior and may not seem intoxicated, but may not remember what happened the next day. "You need to have more information than just the fact that somebody said, 'I don't remember,'

12

in order to begin opining on their mental state at the time they were under the influence." A person capable of sustained goal-oriented behavior "could not be considered unconscious."

In Dr. French's opinion, it was unlikely yet possible that defendant was so drunk that he was unconscious when he moved Mr. San Juan's body from the apartment. Dr. French opined that cleaning up the blood immediately afterwards, "does not sound unconscious . . . ." Dr. French opined that the sequence of events starting with defendant calling Romero to help him dispose of the body, and everything else defendant did with Romero to remove the body, did not indicate to French that defendant "could have been unconscious at that time" because the behavior was "too complex, too focused upon an objective . . . ."

Prefacing his remarks with the observation there were no witnesses to Mr. San Juan's death except the victim and defendant, Dr. French stated the traumatic injuries to Mr. San Juan, followed by strangulation by ligature, gave Dr. French "some hesitations about believing that [defendant] was entirely unconscious." Because all the violence was focused on the victim and the apartment was not trashed, there was nothing consistent with "somebody in an unconscious state . . . flailing about and hitting anything." Also, the change in method of killing from a less lethal method of sustained beating to the more lethal method of ligature, aided Dr. French's conclusion. "This is somewhat speculative, but changing the modality suggests to me that there was some awareness of what was going on."

As for dissociation, Dr. French believed the phenomenon exists, but "there's a lot of fluctuating opinion and debate in the professional community about [it]." Dr. French saw dissociation as a way of stepping aside oneself during a traumatic event such as rape. It "doesn't mean they can't recall it . . . [or] that they become somebody else." He thought it was "tricky" and "a very complex issue," but likely a person in a state of

13

dissociation would not feel the emotional impact of what was going on around him, but would be aware of his actions and making conscious choices.

PTSD is "the opposite of forgetting or not being able to recall." It is not being able to get away from a traumatic experience: inability to escape the recollection of what happened, nightmares, and intrusive recollections. In his experience, when persons with PTSD are faced with a situation that reminds them of the trauma, they could dissociate, but almost invariably the dissociation is brief, provokes feelings of helplessness, confusion, uncertainty and maybe a little fear which, to Dr. French's way of thinking, is the opposite of provoking a violent and focused reaction.

## DISCUSSION

### I. Restrictions on Expert Testimony

Defendant argues the trial court abused its discretion and violated his due process and Sixth Amendment rights to present a mental state defense through expert testimony by placing unwarranted restrictions on Dr. Davies' expert testimony. (U.S. Const., 5th, 6th & 14th Amends., *People v. San Nicolas* (2004) 34 Cal.4th 614, 661.) We review the trial court's ruling for abuse of discretion. (*Id*. at p. 663; § 28, subd. (d); *People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).)

*The Motions*

The prosecutor moved to limit Dr. Davies' testimony about the effect of intoxication and PTSD on defendant's mental state at the time of the killing. He argued that sections 28 and 29 prohibit the defense from eliciting "testimony that in any way indicates the defendant's mental illness interfered with his having the required mental state at the time of the crime." He also argued the court should not permit Dr. Davies to testify about "[s]pecific instances of Defendant experiencing some childhood trauma, and any of the other self-serving statements made by Defendant," such as his statements to police and to Dr. Davies, because to do so would permit the "back-dooring by the defense

14

through their experts" of otherwise inadmissible hearsay. He requested an Evidence Code section 402 hearing prior to any testimony by Dr. Davies.

The defense moved to admit expert opinion testimony from Dr. Davies that defendant suffered from PTSD, dissociation, alcoholism and substance abuse at the time of the killing. Her opinions and diagnoses were based in part on what she knew about defendant's early life, and his statements to her. The defense motion stated Dr. Davies was prepared to testify "that she believes *it is quite likely* that Marroquin was unconscious during the alleged incident" (italics added) and that "an unconscious person could not form a rationale [*sic*] state from which to make logical decisions, aware of the consequences, and would regress to overlearned behaviors from formative years." However, she would not be asked to opine whether defendant had the capacity to form, or did form, malice aforethought.

*Dr. Davies' Testimony at the Evidence Code Section 402 Hearing*

Dr. Davies testified she is fluent in Spanish and interviewed defendant four times without an interpreter in 2011. She also reviewed various medical records, including evaluations by Drs. French and Jeko, and wrote a report.[4] She reviewed a transcript and videotape of defendant's statement to police on September 11, 2008, and used it in arriving at her opinions in this case. She also reviewed the surveillance tapes of the first floor hallway of 520 Taylor Street from September 9 through September 10, 2008.

Dr. Davies diagnosed defendant with PTSD, based on the eight hours she spent with him, her experience in PTSD, the specific questions she asked him, his symptoms, her conversations with defendant's sister about the symptoms she has observed in him,

---

[4] In her report, Dr. Davies states she interviewed defendant at the San Francisco County Jail on August 22, 2011, for two hours, August 25, 2011, for two hours, October 17, 2011, for three hours, and July 2, 2013, for one hour.

and medical records.[5] Defendant's symptoms include nightmares since childhood, lifelong hypervigilance, passive suicidal ideation, poor sleep due to anxiety, somatic problems such as headaches and stomachaches, feelings of isolation from others even when they are right next to him, and intrusive memories of the war in El Salvador.

Defendant went through multiple traumas, including the civil war in El Salvador and abuse by his father. His father had defendant assist in burying the bodies. When he was five or six, defendant saw bodies hanging from trees. Defendant was burned in a sugar cane fire, and regularly kicked and beaten by his father. In Dr. Davies' opinion, these experiences could cause someone to have PTSD.

Dr. Davies described dissociation in relation to PTSD as "a very specific form of what lay people call checking out. It's when one is overwhelmed by memories of the trauma. And one can either feel as if they are apart from oneself, looking at oneself from above, or just not in the situation at all. [¶] At that point in time, the person is not laying down new memories. They are not engaged in the present. They are unable to engage their rational mind to make decisions, to think about consequences, to use their cognitive faculties, whatever they are. Some people might call them on autopilot. [¶] And significantly, . . . other people might not notice it. You might be looking at them from the outside and you might say, 'Hey, you know, things are okay,' but the person is unable to remember . . . what happened. And internally that person is suffering incredibly. They are back inside that trauma that they had gone through." Dissociation can be triggered by

---

[5] Defendant was hospitalized in 2003 at San Francisco General Hospital and treated by a bilingual psychiatrist, Dr. Read. At the time, defendant was terrified that gangs were out to get him and called 911. He was diagnosed with psychosis and bipolar disorder and was involuntarily hospitalized and medicated for seven to 10 days. After discharge from the hospital in March 2003, defendant went to La Posada Acute Diversion Unit, a halfway house for psychiatric patients. La Posada noted PTSD on the discharge summary.

16

memories of the prior trauma. It can be a smell, a phrase, a visual cue or a certain situation, and people are more vulnerable to dissociation when they are intoxicated.

Dr. Davies also diagnosed defendant with polysubstance abuse in full remission while in custody. Dr. Davies concluded that in 2008 immediately before he went to jail, defendant "was abusing alcohol in a . . . really egregious manner. He was drinking all the time, whenever he had money, and in a way so that he could black out, and in a way that left him unable to fulfill his roles, in a way that people were worried about him, that left him feeling guilty, that made him—once he started drinking, he was out of control. He couldn't stop drinking." She based her opinion on her interviews with defendant and on medical records. Defendant told her he had been drinking alcohol since he was 11 years old; neurodevelopmentally, drinking before the age of 20 "really affects your brain." Ten months after his arrest, in July 2009, defendant told Jail Psych Services he had been consuming two pints of alcohol daily for 21 years, as well as regular use of cocaine for the last five years, and that he last used both cocaine and alcohol on the night before his arrest. Forensic and crime scene evidence supported her conclusion: approximately 52 12-ounce bottles of beer were found in the house and the garbage bin; the toxicology report showed the victim had no alcohol in his blood.

Dr. Davies further opined a person can become unconscious from drinking too much alcohol, and a person "can . . . be unconscious but still . . . physically active, walking around, interacting." Defendant told Dr. Davies about his memories of his interactions with Nestor between September 9 and September 11, 2008. Defendant said he came home late. He had been drinking and using cocaine. He was confused because there was a vase by the door, which was unusual. He went into the bathroom while Nestor was in the bath and began chatting with him. Reading from her report, Dr. Davies testified: " 'He came home on the 11th.' [¶] . . . [¶] And after he was talking to him, he moved his head because he didn't respond. And then he said, 'My mind went ugly.' And—and at that point, he says that he was immediately transferred back to El Salvador

17

and the times of death, the times of bodies, the times of burying bodies, the times of guerillas, soldiers, Black Shadows, the times of his father disappearing, not knowing what was going to happen. [¶] And he said he's been confronted with death so many times over his life, almost daily from ages four to 16, and he says that when—confronted with death, there's one thing to do, that's to bury the body. There were . . . no authorities to call in El Salvador." Dr. Davies was also aware of Stephanie Johnson's encounter with defendant, who appeared to be drunk at 5:30 a.m. on September 10, 2008. Based on the above, Dr. Davies opined that defendant's "state of mind before he found Mr. San Juan's body" was that "he was drunk. I think he was so drunk that he had no idea what was going on, and he was so drunk that he was unconscious, and so then he ended up fabricating various versions of the story to try to explain his movements."

Asked if she believed defendant "*could have been* unconscious" when Mr. San Juan was killed, Dr. Davies said, "Yes. " (Italics added.) Based on defendant's habitual intake of alcohol as reported by family members and the reports, including those of Drs. Jeko and French, Dr. Davies opined "[t]he level of alcohol which he was consuming on a regular basis was more than enough to make him unconscious."

Based on the videotape and transcript of defendant's interview with police and her own conversations with him, Dr. Davies opined, "I don't believe he has any idea" how Mr. San Juan died. Defendant initially told police did not know what happened. When the police suggested Mr. San Juan had a heart attack, defendant went with their suggestion. "[T]his is common when someone is unconscious and trying to make sense for themselves of what happened during a time that they were unconscious." In her opinion, it is not possible for a person in an unconscious state to form memories.

Dr. Davies summarized: "Mr. Marroquin was a known excessively heavy drinker, to the point of intoxication and to the point *where he did not remember what happened*, and that's based on multiple sources. [¶] Mr. Marroquin has known PTSD, which involves dissociative episodes, which is a time when *he's not able to form new memories*

18

*or to actually act with conscious intent.* [¶] And Mr. Marroquin *was unable to provide a consistent story of actually what happened the night that Mr. San Juan was murdered.*" (Italics added.) Under further questioning by the prosecutor, Dr. Davies stated it was her opinion that at the time of Mr. San Juan's death defendant *was unconscious*; she believed both alcohol and PTSD contributed to his condition; and that she did not know what triggered the dissociative episode because Mr. Marroquin cannot remember or tell her what it was.

Based on Dr. Weinstein's testing, Dr. Davies also opined defendant's IQ is below average, probably in the range of 60 to 70. She was also of the opinion that defendant was not malingering when he was assessed by her and by Dr. Weinstein.

*The Court's Ruling*

The trial court ruled that sections 28 and 29 did not permit Dr. Davies to testify "whether or not, in her opinion, Mr. Marroquin was unconscious at the time" of Mr. San Juan's death. "That is the mental state. [I]t's exactly the mental state. If she says he's unconscious, that means he hasn't been able to form any intent; he had no intent; he didn't know what he was doing. That's exactly what Penal Code §29 doesn't permit." Nor could she state "why she believes he's unconscious" or "her argument as to why he told different stories." However, she could "describe unconsciousness and how these conditions [PTSD and alcohol abuse] can result in a person being unconscious." She could be asked "whether it would be possible, given all of this, for Mr. Marroquin to have been unconscious without anything further. Is it possible that a person with all these conditions could be unconscious and commit an act and not remember it? And could he have been unconscious at that time?"

Similarly, the court ruled Dr. Davies could not testify that in her opinion defendant was in a dissociative state the first time he moved the body into the hallway by himself, although she could say it was consistent with her diagnosis and analysis. However, she could testify that in her opinion defendant suffers from PTSD, the basis for that opinion,

19

what can happen to a person who has PTSD, and how it manifests itself.  She could also testify about defendant's alcohol dependency and polysubstance abuse; describe it; explain "why she believes that, and what effect that could have on a person's mental capacity, ability to remember, and ability to know what they're doing at the time."

The court also ruled Dr. Davies could opine that defendant was not malingering, and explain why she held that opinion.

The court ruled defendant's statements to her were inadmissible because "it's hearsay . . . [a]nd there's no way of probing that."  However, Dr. Davies could state her opinions were based on her interview with defendant, among "a whole list of things that she looked at."  In other words, she could state, "It's my opinion that he doesn't remember," but she could not state, "I believe he didn't remember because he told me . . . [this]."

Similarly, with respect to defendant's statement to police, the court limited Dr. Davies' testimony to saying "that she reviewed it, and that's one of the things she's basing her conclusions on, without going into detail about it's clear when he says this that this means this, because that's for the jury to decide."

*Analysis*

The permissible scope of expert testimony under sections 25, 28 and 29 has been extensively studied in the case law.  Section 25, subdivision (a), abolishes the defense of diminished capacity.  Section 28, subdivision (a) makes inadmissible, in a criminal action, *capacity* evidence; that is, "[e]vidence of mental disease, mental defect, or mental disorder" offered to "show or negate *capacity to form* any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (Italics added.) It also carves out an exception to section 25 for evidence of diminished *actuality*:  "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused *actually formed* a required specific intent, premeditated, deliberated, or

20

harbored malice aforethought, when a specific intent crime is charged." (Italics added.) However, section 28, subdivision (d), preserves the trial court's "discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense." (See *People v. Pearson* (2013) 56 Cal.4th 393, 450 (*Pearson*).) Finally, section 29 restricts the permissible scope of expert testimony on diminished actuality: "[A]ny expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged." Nevertheless, " '[s]ections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime.' " (*Pearson*, at p. 451, citing *Cortes, supra,* 192 Cal.App.4th at p. 9-10; *People v. Coddington* (2000) 23 Cal.4th 529, 583 (*Coddington*), overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 & fn. 13.).)

"[S]ections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Cortes, supra,* 192 Cal.App.4th at p. 908.) "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is *an element of a charged offense* or presenting evidence in support of that defense. *They preclude only expert opinion that the element was not present.*" (*Coddington, supra,* 23 Cal.4th at p. 583, italics added.) "By its terms, section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a

21

defendant had the required mental state for conviction of a crime.  *It prohibits no more than that.*"  (*People v. Ochoa* (1998) (19 Cal.4th 353, 431, italics added (*Ochoa*).)

Delineating the proper scope of expert testimony from mental health professionals on this subject always boils down to whether the expert's proposed testimony expresses an opinion " 'tantamount to' " (*Cortes*, *supra*, 192 Cal.App.4th at p. 910) or the "functional equivalent of" (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327) an opinion the defendant did or did not have the requisite criminal intent ("the ultimate fact").  For "[a]n expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved.  Nor may an expert evade section 29 by offering the opinion that the defendant at the time he acted had a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state."  (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364.)

The recent Supreme Court opinion in *Pearson, supra*, 56 Cal.4th 393, informs our analysis of where to draw the line between permissible and objectionable expert testimony on the defendant's mental state.  In *Pearson,* the defendant shot and killed two former coworkers after alluding to "the infamous 1993 massacre of numerous employees in a law office located at 101 California Street in San Francisco."  (*Id.* at p. 403.)  At trial, defense counsel asked his expert whether defendant's threats to "do a '101 California' " indicated he thought about committing a " '101 California' " before the murders.  The trial court sustained the prosecutor's objection that defense counsel was trying to elicit the expert's opinion on the mental elements of premeditation and deliberation.  (*Id*. at pp. 442–443.)  Our Supreme Court found no abuse of discretion:  "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand. . . .  The court instructed the jury that the 'word "deliberate," which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of

action. [¶] The word "premeditated" relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action.' (See CALJIC No. 8.20.) [¶] The trial court acted within its discretion in finding that the question at issue here essentially asked the expert to provide an opinion about the required mental state (premeditation and deliberation) and thus was improper under section 29." (*Id.* at pp. 443–444.) Similarly, objections were properly sustained to the defense expert's testimony that "(1) '[defendant] seemed to be [in] a reactive kind of state, rather than . . . cold and calculated'; (2) '[At the time of the crimes, defendant] didn't seem to know what he was doing'; and (3) 'defendant's impairment [at the time of the commission of the crimes] definitely needs to be taken into consideration here. It's part of why he couldn't handle the stress he was under.' " (*Pearson*, at p. 451.)

On the other hand, there was nothing improper about the prosecution expert's testimony that defendant's comment " 'I ain't no joke,' " made before and after defendant shot one of the victims, indicated anger, retribution and revenge. This testimony "properly related to defendant's general mental condition during his killing spree and did not express an opinion on his criminal intent when he shot the victims." (*Pearson*, *supra*, 56 Cal.4th at p. 451.) Similarly, the prosecution's expert was permitted to testify that defendant's conduct "could not be explained by 'anything delusional or hallucinatory,' " because this comment "did not describe defendant's mental state at the time he shot the victims, but rather, his diagnosed mental condition." (*Ibid.*) Finally, it was permissible for the prosecution's expert to offer "the abstract opinion" that the defendant's diagnosed personality disorders, obsessive compulsiveness and schizoid paranoia, would not " 'in any way prevent *a person* from committing deliberate and premeditated murder,' " since this opinion "was merely 'descriptive of the condition that [the expert] diagnosed' and the 'comments did not go to defendant's mental state at the time of the events but, rather, gave jurors an abstract description of defendant's diagnosed condition that they could

23

consider when deciding the ultimate issue of whether he premeditated and deliberated the murders.' " (*Id.* at p. 452; italics added.)

Dissociation is not itself a "mental state required for the commission of the crime charged" (§ 25) "with which the accused committed the act." (§ 28.) Nor is it, strictly speaking, "the opposite of " a required mental state. Dissociation is not a legal concept at all; it is a diagnosable neuoropsychological phenomenon or condition that can affect persons who suffer from PTSD. It may or may not coexist with criminal intent.

In our case, Dr. Davies described dissociation as an episode where *a person* feels completely separated from reality and is not mentally connected to where he is physically. She referenced as examples people who have engaged in substantial conduct but not remembered it. They can do very complex activities, and "[n]ot only are they not aware that they're doing it, but they're not able to lay down memories." However, even at the section 402 hearing, Dr. Davies did not opine defendant was in a dissociated state when Mr. San Juan died. Instead, she offered the opinion that defendant was in a dissociated state when he dragged the body in its trash bag out into the hallway by himself. In our view, based on *Cortes*, *supra*, 192 Cal.App.4th 873 and *Pearson*, *supra*, 56 Cal.4th 393, Dr. Davies properly testified before the jury that, in her opinion, a person with PTSD *could have been* in a dissociative state while dragging a body bag into the hallway, as defendant is shown to be doing in the videotape, without really being aware of doing it. In our view, she *should also have been able to testify defendant was* in such a state. The unadorned opinion that the defendant was in a dissociated state is not the equivalent of an opinion that the defendant was incapable of forming, or did not actually form, the intent to kill, or malice aforethought, or premeditation or deliberation. Such an opinion did not address defendant's mental state at the time of the killing.

In *Cortes*, supra, 192 Cal.App.4th 873, the court held the testifying expert, Dr. Dondershine, *should* have been able to opine that the defendant was in a dissociated state when stabbed the victim. (*Id*. at pp. 909, 911.) In our view, Dr. Davies' opinion

24

that defendant was in a dissociated state when he moved the body would not have usurped the jury's factfinding role or violated section 29. At most, it might have provided the jury a less tentative basis to infer that if defendant was in a dissociated state then, he might have been in such a state earlier, when he killed Mr. San Juan.

Legal unconsciousness is different. Like dissociation, unconsciousness is a neuropsychological phenomenon or condition which can affect the defendant's actual formation of criminal intent. But it is more than that: unconsciousness is also a statutory defense, enacted in 1872, of incapacity that negates criminal intent and vitiates criminal responsibility. (§ 26, par. Four.) For unconsciousness due to voluntary intoxication to reduce murder to involuntary manslaughter, it "need not mean that the actor lies still and unresponsive: section 26 describes as '[in]capable of committing crimes . . . [¶] . . . [¶] . . . [p]ersons who *committed the act* . . . without being conscious thereof.' (Italics added.) Thus unconsciousness ' "can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." ' " (*Ochoa, supra,* 19 Cal.4th at pp. 423–424.) Here, the jury was instructed that unconsciousness was the same as *not being aware of* one's actions or the nature of one's actions.[6] For an expert to say that the

---

[6] The jury was instructed in relevant part: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement *but may not be aware* of his or her actions or the nature of those actions. [¶] . . . [¶] . . . If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. [¶] Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: [¶] 1. The defendant killed without legal justification or excuse; [¶] 2. The defendant did not act with the intent to kill; [¶] 3.The defendant did not act with a conscious disregard for human life; [¶] AND [¶] 4. As a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 626.)

The jury was also instructed it could consider the evidence presented on defendant's mental disease "only for the limited purpose of deciding whether, at the time

25

defendant was unconscious when he killed is tantamount to, or the functional equivalent of, stating the opinion he was both factually and legally unaware of what he was doing and therefore not capable of criminal agency or intent. In our view, the trial court did not abuse its discretion by limiting Dr. Davies' opinion to the likelihood or possibility that defendant was unconscious when Mr. San Juan was killed.

The trial court also limited Dr. Davies' testimony about the bases of her opinions. As noted above, the trial court excluded on hearsay grounds her proposed testimony about the content of defendant's statement to her pertaining to his recollection of his state of mind at the time Mr. Juan was killed.[7] Defendant argues the content of defendant's statement to her was not hearsay because it was not "offered to prove the truth of the matter stated." (Evid. Code, § 1200.) He also asserts his statements were admissible as nonhearsay circumstantial evidence of defendant's mental state. We note he did not

of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: specific intent and/or present ability to premeditate and deliberate. If the People have not met this burden, you must find the defendant not guilty of Murder." (CALCRIM No. 3428.)

Finally, the jury was instructed on first and second degree murder (CALCRIM Nos. 520, 521) and involuntary manslaughter as a lesser included offense of murder. (CALCRIM No. 580.)

[7] According to Dr. Davies' report dated April 7, 2014, defendant said "[h]e came home on the 11th and noticed that there was a vase blocking the door. He said, 'Hi Nestor' and noticed he was in the bathtub, nude. 'I was drunk, talking to him, then I moved his head because he didn't respond . . . my mind went ugly . . . in my county when there's death, you open a hole and put them in it. I wanted to take this out like in El Salvador so it wouldn't smell bad.' [Mentally] 'I was back in my country. I wanted to take it out.' He says that at that point, he felt like, 'I wasn't in San Francisco. I was in my country, living that time.' Mr. Marroquin doesn't remember taking the body out the 1st time, or going in and out, which he did multiple times. [¶] He panicked and did not think he could call the police. 'I had so much fear in the moment.' His history with the police and authorities has been troublesome, watching the death squads in El Salvador. Growing up, there were no authorities he could trust. At that point he lost all emotion, and dissociated—i.e., he kept acting but did not feel as if he was in his own body."

26

make this latter argument in the trial court; it is therefore waived.  (*In re Seaton* (2004) 34 Cal.4th 193, 198; *People v. Jenkins* (2000) 22 Cal.4th 900, 1000.)  In any event, we disagree.

As circumstantial evidence of defendant's mental state at the time he made the statements to Dr. Davies, they were irrelevant to any disputed issue in the case.  (Evid. Code, § 210.)  As evidence of defendant's previously existing mental state, that is, his mental state at the time of the killing, defendant's statements to Dr. Davies were relevant, but only if it was true defendant felt mentally transported to his past and a different country.  "[E]vidence of a statement of the declarant's state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) at a time prior to the statement is not made inadmissible by the hearsay rule if:  [¶]  (a) The declarant is unavailable as a witness; and [¶] (b) The evidence is offered to prove such prior state of mind, emotion, or physical sensation when it is itself an issue in the action and the evidence is not offered to prove any fact other than such state of mind, emotion, or physical sensation."  (Evid. Code, § 1251.)  However, defendant's exercise of his privilege not to testify did not render him "unavailable" for this purpose.  (*People v. Edwards* (1991) 54 Cal.3d 787, 819.)  Therefore, his statement to Dr. Davies was not admissible as circumstantial evidence of his state of mind at the time of the killing.  *People v. Cooper* (2007) 148 Cal.App.4th 731 (*Cooper*), on which defendant relies, is unhelpful.  The *Cooper* court held that an expert witness's reliance on the elderly victim's videotaped statements for his opinion regarding the victim's mental competence did not violate the confrontation clause as interpreted by *Crawford v. Washington* (2004) 541 U.S. 36 because "[s]uch evidence is not admitted for the truth of the matter asserted."[8]  (*Cooper*, at p. 747.)

_____

[8] We note this very question is currently under review by the California Supreme Court.  (See, e.g., *People v. Sanchez* (2014) 223 Cal.App.4th 1 (review granted May 14, 2014, S216681.)

27

Defendant's statement to Dr. Davies was presumptively admissible as the basis for her opinions. "Since an expert's opinion ' "is no better than the facts on which it is based" ' [citation], experts should generally be allowed to testify to all facts upon which they base their opinions. [Citation.] ' "An expert may generally base his opinion on any 'matter' known to him, *including hearsay not otherwise admissible*, which may 'reasonably . . . be relied upon' for that purpose." ' " (*People v. Bordelon*, *supra*, 162 Cal.App.4th at p. 1324, italics added.) However, " 'Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " " '[P]rejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.)

In *Bordelon, supra*, 162 Cal.App.4th 1311, this court concluded the trial court erroneously sustained a hearsay objection to the defense psychologist's testimony that defendant told a parole office psychologist, during the week between his release on parole and his commission of the charged bank robbery, " 'that he felt lost [when] he was out [of prison].' " The defense psychologist considered this statement an example of behavior consistent with the defendant's institutionalization defense. (*Id.* at p. 1324.) Because the statement was relevant to the defense, supportive of the defense psychologist's opinion, made at a time when there was arguably no motive for fabrication, and reported by a reliable source, the court found "it was an abuse of discretion to prevent [the psychologist] from testifying to his reliance on the statement." (*Id.* at p. 1325.) On the other hand, in *People v. Hughes* (2002) 27 Cal.4th 287 (*Hughes*), the defense expert was barred from testifying "about defendant's alleged hearsay statements to the defense investigator, which were inconsistent with his statements to the police." The *Hughes* court found no abuse of discretion. (*Id.* at p. 339.)

28

In our view, this case is more like *Bordelon* than *Hughes*. Except for defendant's statement about seeing Mr. San Juan naked in the bathtub, which could have been easily excised, defendant's statement was not necessarily inconsistent with his statement to police. It was highly relevant to his defense of unconsciousness, supportive of Dr. Davies' opinions, and was reported by a reliable source, the doctor herself. As for arguable motive to fabricate, whenever a defendant facing trial and punishment speaks to a psychiatrist or psychologist hired to evaluate his or her mental state, there is a potential motive to lie. Juries implicitly understand this. Mental health professionals test for malingering. Yet, a mental health expert is "entitled to base [an] opinion on observations of, and statements made by, the patient during a routine psychological interview." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155; see generally, 1 Witkin, Cal. Evid. (5th ed. 2012) Opinion Evidence, § 34, p. 652.) Indeed, experts routinely testify about the defendants' statements to them. (See, e.g., *People v. Bell* (2007) 40 Cal.4th 582, 609 [" 'Mr. Bell described [stabbing Joey] as feeling outside of himself, observing himself, almost observing in a trance like state.' "]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 392 ["Dr. Vicary acknowledged that defendant had lied to him, denying his involvement in the Perez and Ferguson shootings, although he had previously admitted responsibility to the UCLA psychiatrist."]; *Coddington*, *supra*, 23 Cal.4th at p. 560 ["Dr. Satten found no inconsistency between appellant's statement to him that he had received no messages on the day he lured the victims to his trailer and his statement to another expert that the traffic lights were all green on the way to the trailer."]; *People v. Hernandez* (2000) 22 Cal.4th 512, 517 [a court-appointed psychiatrist testified "defendant believed that he was a messenger of God, that everybody was out to kill him, and that people were using witchcraft against him."]; *People v. McCowan* (1986) 182 Cal.App.3d 1,10 ["In Dr. Galioni's interviews with defendant following completion of the guilt phase, defendant stated he felt angry and 'disjointed' at the time of the offenses."]; see also *People v. Jackson* (1984) 152 Cal.App.3d 961, 965 [defendant told psychiatrist that "[i]n

29

the present incident, Jackson believed himself to be acting on behalf of the 'Order of the Knights of St. Michael' and the 'Kingdom of Heaven.' "].)

We are mindful of the trial court's "discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' . . . [¶] 'Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.] . . . Sometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*People v. Bell, supra*, 40 Cal.4th at p. 608.) Nevertheless, on this record, we perceive a certain arbitrariness in the court's ruling. Dr. Jeko was afforded great leeway to testify about defendant's statements to her, including the statement that he was not blacked out from alcohol consumption during the "global" time frame of the events of September 9 to 11, 2008. We are not convinced the trial court here carefully weighed the pros and cons of editing defendant's statement and giving a limiting instruction instead of suppressing defendant's statement to Dr. Davies altogether. In our view, the trial court abused its discretion in this instance. For similar reasons, we also believe the court should have allowed Dr. Davies to explain how defendant's statement to police informed her opinions.

Nevertheless, in light of the breadth of Dr. Davies' testimony about defendant, the errors were harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Bell, supra*, 40 Cal.4th at p. 610 & fn. 10.) Dr. Davies was permitted to testify to almost everything she said in the Evidence Code section 402 hearing. She testified extensively about defendant's childhood traumas, history of hospitalizations, diagnoses of PTSD, alcoholism, and low IQ, and how such conditions manifested themselves generally and in defendant's life. She described dissociation and unconsciousness. She testified she

30

believed defendant could have been in a dissociative state when he dragged the garbage bag with Mr. San Juan's body in it into the hallway the first time. She testified defendant was likely in an unconscious state when he killed defendant, and that she believed defendant did not, in fact, remember the killing. The jury also had before it a videotape and audiotape of defendant's statement to police, in which he repeatedly denied knowing what happened to Mr. San Juan, and the videotape of defendant dragging the body bag into the hallway. In our view, this is not a case like *Cortes, supra,* 192 Cal.App.4th 873, where the expert's testimony was so restricted the jury learned nothing about defendant's diagnoses and had no basis to connect the expert's testimony about dissociation in general with the defendant Cortes in particular. Here, unlike *Cortes*, the jury had ample basis "to infer that defendant had lapsed into a dissociated state" or unconsciousness "in which he might not have deliberately premeditated" the killing or formed the intent to kill. (*Cortes,* at p. 912.) In fact, despite the restrictions on Dr. Davies testimony, the jury evidently did infer defendant lacked the requisite intent for first degree murder, despite overwhelming evidence defendant inflicted numerous traumatic wounds on Mr. San Juan's body and also applied a ligature to his neck to kill him. Under these circumstances, defendant was not deprived of his right to present a defense, and the errors were harmless under any standard. (*People v. Bell,* at p. 610 & fn. 10.)

## II.     Review of In Camera *Pitchess/Brady* Proceedings

Defendant requests we review the sealed transcripts of the People's two *Pitchess/Brady* motions for judicial error. (*Pitchess, supra,* 11 Cal.3d 531; *Brady*, *supra*, 373 U.S. 83.) The Attorney General agrees this court has the "authority to review a sealed record pertaining to a *Pitchess* motion."[9]

_____

[9] The Attorney General also suggests that defendant lacks "*standing* to ask the court to review the correctness of the trial court's ruling on a *Pitchess* motion brought by the prosecution." The Attorney General does not develop this thought beyond stating that defendant "had equal access to the confidential records of police officers, and was required to bring his own *Pitchess* motion," citing *People v. Superior Court* (*Johnson*)

31

On November 22, 2010, the People made a written motion for discovery of personnel records in the custody of the San Francisco Police Department (Department) pertaining to Officer Antonio Casillas. The motion alleged that "the San Francisco Police Department ha[d] informed the District Attorney's Office that Antonio Casillas has material in his personnel file that may be subject to disclosure under *Brady* . . . ."[10] An in camera hearing was held on December 10, 2010, before the Honorable James P. Collins.

The prosecutor made a second written *Pitchess* motion on September 2, 2011, requesting the court review in camera the confidential personnel records of San Francisco Police Officers Cameron Mullins and Charles Cecil in the custody of the Office of the Chief Medical Examiner. The motion alleged the Chief Medical Examiner had informed the District Attorney's Office the two officers' personnel files might contain *Brady* material. The hearing was held on October 27, 2011, before the Honorable Angela Bradstreet. None of the police officers identified in the People's motions testified at trial.

_____

(2015) 61 Cal.4th 696 (*Johnson*). In our view, the Supreme Court did not *require* defendants to file follow-up *Pitchess* motions, nor did it address whether defendants have standing to seek appellate review of the trial court's ruling on the prosecution's *Pitchess* motion. (Cf. *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1046 (*Alford*) [prosecutor lacks standing to demand defense disclose fruits of successful *Pitchess* motion.] "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.) Furthermore, failure to furnish authority on a particular point allows the court to deem it waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

[10] The motion was brought pursuant to Bureau Order No. 2010-11, dated August 13, 2010, which provides that when the Department identifies an officer or civilian employee as having possible *Brady* material in his or her personnel file, the Department will inform the Chief of the Criminal Division in the District Attorney's Office of the existence of the material, specifying only the employee and the fact that such material exists. No actual materials from the personnel file will be disclosed to the District Attorney's Office at that time. If the District Attorney's office determines the identified officer is a material witness in a pending criminal case, or may be called as a witness, the District Attorney shall make a motion for in camera judicial review of the material to determine whether the prosecution is required to disclose them.

In *Johnson*, *supra*, 61 Cal.4th 696, our Supreme Court held prosecutors do not have carte blanche access to a police officer's confidential personnel file in search of potentially exculpatory evidence it must disclose to the defense under *Brady, supra*, 373 U.S. 83, when the police department informs the prosecutor that such evidence exists in a police officer's personnel file.  Instead, the prosecutor must file a *Pitchess* motion and follow the same statutory procedures defendants must follow in order to access information in confidential police personnel files.  (*Johnson,* at p. 705.)  The court also held "the prosecution fulfills its *Brady* duty as regards the police department's tip if it informs the defense of what the police department informed it, namely, that the specified records might contain exculpatory information.  That way, defendants *may decide for themselves* whether to bring a *Pitchess* motion.  The information the police department has provided, together with some explanation of how the officers' credibility might be relevant to the case, would satisfy the threshold showing a defendant must make in order to trigger judicial review of the records under the *Pitchess* procedures." (*Johnson*, at pp. 705–706, italics added.)

Presumably, the District Attorney complied with his duty to disclose under *Johnson*, *supra*, 61 Cal.4th 696.[11]  So far as this record shows, the defense did not make any *Pitchess* motions.  Defendant would certainly be entitled to appellate review of his own *Pitchess* motion, if he made one.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1229.)  But as to the People's *Pitchess* motion, assuming arguendo defendant has a "legitimate interest in what is essentially a third party discovery proceeding" as to him (*Alford*, *supra*, 29 Cal.4th at p. 1045), we fail to see how defendant has preserved that

---

[11] The appellate record contains a protective order signed by the judge, the district attorney and the defense attorney as to Officer Casillas.  The record also contains a protective order signed only by the district attorney as to records from the Office of the Chief Medical Examiner as to Officers Cecil and Mullins, but a request for a continuance filed by defense counsel indicates he was advised by the assistant district attorney that "*Brady* materials exist for the OCME Investigators who worked on this case."

33

interest when he had notice of the trial court's ruling and failed to bring his own *Pitchess* motion for disclosure of *Brady* materials. Under these circumstances, we decline to engage the courts' limited resources in a search for records which defendant did not consider worth the effort of a motion. We deem the request for review waived.

**DISPOSITION**

The judgment is affirmed.

_____

DONDERO, J.

We concur:

_____

HUMES, P. J.

_____

BANKE, J.